1
2
3
4
5
6
7

NANCI E. NISHIMURA (SBN 152621)
nnishimura@cpmlegal.com
ALISON E. CORDOVA (SBN 284982)
acordova@cpmlegal.com
ANDREW L. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Telephone:    (650) 697-6000
Facsimile:    (650) 697-0577

8
9
10
11
12
13

KELLY W. WEIL (SBN 291398)
kweil@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Boulevard, Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008
Facsimile: (310) 392-0111

P. TERRY ANDERLINI (SBN 44783)
tanderlini@amlawoffice.com
CAROLINE A. RIETZ (SBN 326412)
creitz@amlawoffice.com
**ANDERLINI & McSWEENEY LLP**
66 Bovet Road, Suite 285
San Mateo, California 94402
Telephone:    (650) 242-4884
Facsimile:    (650) 212-0001

14

*Attorneys for Plaintiffs*

15
16

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

17
18
19
20
21
22
23
24
25
26
27
28

**EVA YUK WAH MA WONG,**
individually and as personal
representative of the **ESTATE OF
RONALD WONG; BENJAMIN
WONG**, individually; and the **ESTATE
OF RONALD WONG,**

                    Plaintiffs,

        v.

**CARNIVAL CORPORATION & PLC,**
a Bermuda Corporation; and **PRINCESS
CRUISE LINES, LTD.,** a Bermuda
Corporation,

                    Defendants.

CASE NO:

**COMPLAINT for:**

  1.  **NEGLIGENCE –
      PERSONAL INJURIES AND
      WRONGFUL DEATH**

  2.  **SURVIVAL ACTION**

**DEMAND FOR JURY TRIAL**

**COMPLAINT**

# **TABLE CONTENTS**

**I.**   **INTRODUCTION** ................................................................................. **1**

**II.**   **THE PARTIES** ..................................................................................... **4**

    A.   PLAINTIFFS ................................................................................. 4

    B.   DEFENDANTS .............................................................................. 5

    C.   ALTER EGO, AGENCY & JOINT VENTURE.................................... 6

**III.**   **JURISDICTION** ................................................................................ **7**

**IV.**   **VENUE** ................................................................................................ **9**

**V.**   **FACTUAL ALLEGATIONS** ............................................................. **9**

    A.   THE CRUISE SHIP INDUSTRY RAKES IN MASSIVE PROFITS BY SELLING LUXURY TRAVEL TO AMERICANS ............................... 9

    B.   DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS AND DEADLY BEFORE BOARDING THE GRAND PRINCESS IN SAN FRANCISCO ...................................................................... 11

    C.   DEFENDANTS WERE MADE AWARE THAT A PRIOR PASSENGER ON THE GRAND PRINCESS HAD LIKELY ARMED THE SHIP WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS PRIOR TO BOARDING NEW PASSENGERS IN SAN FRANCISCO ............................................................................ 15

    D.   DESPITE KNOWING THE GRAND PRINCESS WAS ARMED WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS BOARDED THE SHIP AND FAILED TO TAKE ANY SAFETY PRECAUTIONS OR WARN PASSENGERS .......... 17

    E.   DEFENDANTS DID THIS BECAUSE THEY MAKE THE LION'S SHARE OF THEIR PROFITS FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES................................................ 18

    F.   DEFENDANTS FAILED TO WARN OR ADVISE PASSENGERS OF THE VIRUS BEING ON-BOARD THE GRAND PRINCESS UNTIL MARCH 4, 2020—OVER A WEEK AFTER BOARDING ............... 19

    G.   DEFENDANTS UNLOAD PASSENGERS TO DIE ONSHORE ...... 21

    H.   CARNIVAL IS NOW THE TARGET OF CONGRESSIONAL INVESTIGATION.......................................................................... 23

**VI.**   **NOTICE**.............................................................................................. **25**

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT**

**VII.  CLAIMS** ........................................................................................... **25**

    FIRST CLAIM
    NEGLIGENCE
    (Against Each Defendant) ............................................................. 25

    SECOND CLAIM
    NEGLIGENCE - SURVIVOR CAUSE OF ACTION
    (Against Each Defendant) ............................................................. 29

**VIII. PRAYER FOR RELIEF AND DEMAND FOR JURY** ............................. **30**

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT**

ii

PLAINTIFFS EVA YUK WAH MA WONG ("MRS. WONG"), individually, and surviving spouse of RONALD WONG ("MR. WONG"), deceased, and as personal representative of the ESTATE OF RONALD WONG, and BENJAMIN WONG ("BEN"), in his individual capacity as surviving son of RONALD WONG (collectively hereinafter "PLAINTIFFS") bring this action for personal injuries and wrongful death against DEFENDANTS **PRINCESS CRUISE LINES, LTD. ("**PRINCESS**"),** and **CARNIVAL CORPORATION & PLC ("**CARNIVAL**"),** (collectively hereinafter "DEFENDANTS").

I.   **INTRODUCTION**

1.   When MR. and MRS. WONG boarded the Grand Princess cruise ship in San Francisco, California on February 21, 2020, neither of them had any knowledge, notice, and/or warning that they were boarding a cruise ship armed with a super virus known to be highly contagious, kill at-risk populations quickly, and have no cure—COVID-19.

2.   Yet DEFENDANTS CARNIVAL and PRINCESS, and/or each of them and their managing agents, including Dr. Grant Tarling, the Chief Medical Officer, knew or should have known that a prior passenger on-board the vessel was infected with COVID-19 and had been experiencing severe respiratory symptoms for the past seven (7) days while traveling on the *Grand Princess*, resulting in the entire ship and crew being exposed to and potential carriers of the highly contagious and deathly virus, all immediately prior to the *Grand Princess* docking in San Francisco, California, to off-load some passengers and pick up others on February 21, 2020.

3.   Yet DEFENDANTS, and/or each of them, negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of its passengers, invited and boarded MR. and MRS. WONG onto the deathly cruise ship armed with COVID-19, without providing any notice, warning, or precautionary medical apparatuses, such as masks, and without imposing any safety precautions, such as social distancing, and/or imposing quarantine on prior exposed passengers

and/or crew. DEFENDANTS, and/or each of them, also negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of its passengers, failed to disinfect, decontaminate, and/or sanitize the exposed surfaces of the cruise ship prior to boarding MR. and MRS. WONG and failed to administer any COVID-19 tests to any prior passengers and/or crew, leaving all new passengers, including MR. and MRS. WONG, completely, unknowingly, and inescapably exposed to the deathly virus.

4.    DEFENDANTS, and/or each of them, had knowledge of the infectious and deathly danger posed by the Coronavirus before they allowed new passengers to board the *Grand Princess* in San Francisco on February 21, 2020, joining them with 62 prior passengers and 1,000 crew members who had traveled with and been in close contact with the infected passenger for at least seven (7) days prior.

5.    In fact, another of DEFENDANTS' cruise ships, the Diamond Princess, had been under quarantine at Yokohama's port near Tokyo since February 3rd, and as of February 20, 2020, world news was reporting that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." And further, "**[a] total of 634 people from the Diamond Princess have tested positive for COVID-19**, the Japanese agency said. **More than half that number are identified as "asymptomatic pathogen carriers," meaning that while they don't show signs of the illness, they can still transmit the disease to others or become sick themselves**."[1] An NPR article reporting on the tragedy also stated: "When passengers test positive for the novel coronavirus, they're taken off the Diamond Princess and sent to local hospitals. **Those diagnoses also reset the 14-day quarantine period *for their traveling partners and close contacts***."[2]

---

[1] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi
[2] *Id.*

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

6.      Prior to February 21, 2020 when PLAINTIFFS WONG boarded the *Grand Princess*, COVID-19 had killed over 2,000 people and there were over 75,000 cases reported worldwide."[3]

7.      Dr. Tarling later reported "the company believed the virus was brought aboard the *Grand Princess* by a passenger on a previous cruise" who boarded for Mexico on February 11 and disembarked on February 21, but had reported to medical professionals on the cruise ship that he "had fallen ill around two or three days after boarding the ship."[4]  The afflicted passenger aboard the *Grand Princess* sought medical treatment from the ship's medical center on February 20, but DEFENDANTS, and/or each of them, took **no action** upon the ship's arrival back in San Francisco the following day.

8.      According to industry experts, commercial cruise ship companies make money in two ways: tickets sales and on-board purchases. While tickets represent a majority of revenue for this companies, ***onboard purchases account for the lion's share of the profit***.[5] Creating an obvious financial incentive for the officers, directors, and/or managing agents of DEFENDANTS to knowingly board passengers on a cruise ship armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket.

9.      Further, Dr. Tarling knows about the virulent nature of infectious diseases.  CARNIVAL touts his 27 years of experience overseeing the health and welfare of 12 million passengers annually and thousands of crew members aboard CARNIVAL'S 104 cruise ships across its nine cruise lines.  Dr. Tarling is an internationally-recognized medical expert in the cruise industry for developing and implementing policies and procedures to protect global travelers:

---

[3] *Id.*
[4] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020.
[5] *Id.*

**COMPLAINT**                                                                                      3

*Dr. Tarling is also charged with developing and implementing research-based public health policies and procedures that protect large populations of global travelers. His expertise is routinely called upon by national and international health authorities to help develop prevention and control measures to mitigate the global spread of communicable diseases such as Zika, Ebola, MERS, Chikungunya, Legionella, noroviruses and novel influenza viruses.*[6]



The coronavirus-stricken Grand Princess cruise ship docked in San Francisco, Calif., on April 7, 2020.
*MediaNews Group/East Bay Times v/MediaNews Group via Getty Images*

## II. <u>THE PARTIES</u>

### A. PLAINTIFFS

10. Plaintiff **Eva Yuk Wah Ma Wong** ("MRS. WONG") is and was at all times relevant to this Complaint, a resident of the City and County of San Francisco, California. MRS. WONG was a ticketed passenger who boarded the *Grand Princess* cruise on February 21, 2020 in San Francisco. MRS. WONG is also the surviving

---

[6] https://www.princess.com/news/notices_and_advisories/notices/dr-grant-tarling-chief-medical-officer.html

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

spouse of MR. WONG, and is a proper personal representative and heir pursuant to California law and admiralty law. By virtue of the premises, MRS. WONG is lawfully entitled to initiate this Complaint in her individual capacity, as well as on behalf of the ESTATE OF RONALD WONG in pursuit of a survival action.

11.    Plaintiff **Ronald Wong** ("MR. WONG"), now deceased, was at all times relevant to this Complaint a resident of the City and County of San Francisco, California. MR. WONG was a ticketed passenger who boarded the *Grand Princess* cruise on February 21, 2020 in San Francisco.

12.    Plaintiff **Benjamin Wong** ("BENJAMIN") is and was at all times relevant to this Complaint, a resident of the City and County of San Francisco, California.   BENJAMIN is the son of MR. WONG, and is a proper personal representative and heir pursuant to California law and admiralty law.

B.    **DEFENDANTS**

13.    Defendant **Carnival Corporation** ("CARNIVAL") was incorporated in Panama in 1972. Carnival plc was incorporated in Wales, United Kingdom in 2000. As described by CARNIVAL in a filing with the Securities and Exchange Commission, "Carnival Corporation and Carnival plc operate a dual listed company ('DLC'), whereby the businesses of Carnival Corporation and Carnival plc are combined through a number of contracts and through provisions in Carnival Corporation's Articles of Incorporation and By-Laws and Carnival plcs's Articles of Association."   Carnival Corporation and Carnival plc operate as a single economic enterprise, and share a senior executive management team and identical Boards of Directors. The dual-listed company has its headquarters in Miami, Florida. This lawsuit is being brought against the dual-listed company and/or Carnival Corporation (collectively, "CARNIVAL").

14.    Defendant **Princess Cruise Lines LTD** ("PRINCESS") is incorporated in Bermuda, with its headquarters in Santa Clarita, California. Santa Clarita serves as

the nerve center for PRINCESS, and all major decisions regarding operation of its cruise ships are made at the headquarters in Santa Clarita, California.

15.   At all times hereto, PRINCESS and CARNIVAL advertised, marketed, sold, and profited (directly or indirectly) from, and controlled and operated the cruise ship *Grand Princess*.



[7]

## C.   ALTER EGO, AGENCY & JOINT VENTURE

16.   DEFENDANTS PRINCESS and CARNIVAL are alter egos of each other such that the corporate form should be disregarded.

17.   CARNIVAL has ownership and control over PRINCESS, which is organized under Holland America Group within Carnival Corporation & plc. CARNIVAL has claimed in filings with the Securities and Exchange Commission (SEC) that it wholly owns PRINCESS as a subsidiary.

18.   CARNIVAL and PRINCESS share the same Board of Directors and almost all of the same executive officers, and appear to use the same assets.

---

[7] Princess Cruises headquarters in Santa Clarita, California.

19.    CARNIVAL serves as the parent company for PRINCESS, which it calls a "Carnival Brand" cruise line and which CARNIVAL refers to as "part of our growing business." CARNIVAL exerts control over PRINCESS's business and day-to-day operations.

20.    CARNIVAL and PRINCESS are collectively referred to herein as "CARNIVAL" or "DEFENDANTS."

21.    At all times herein mentioned, DEFENDANTS, and/or each of them, hereinabove, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other DEFENDANTS named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each DEFENDANT has ratified and approved the acts of each of the remaining DEFENDANTS.  Each of the DEFENDANTS aided and abetted, encouraged, and rendered substantial assistance to the other DEFENDANTS in breaching their obligations to PLAINTIFFS, as alleged herein.  In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, as alleged herein, each of the DEFENDANTS acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

### III.    JURISDICTION

22.    This Court has Admiralty subject matter jurisdiction pursuant to 28 U.S.C. section 1333 as the wrongdoing alleged in this Complaint arose, occurred, and/or took effect on navigable waters and bears a significant relationship to traditional maritime activity, i.e. it occurred while DEFENDANTS, who engage in the commerce of luxury cruises, boarded new passengers on the *Grand Princess* cruise ship docked in the San Francisco Bay.

23.     This Court also has diversity of citizenship jurisdiction pursuant to 28 U.S.C. section 1332(a)(1) because PLAINTIFFS' claims exceed $75,000 and because PLAINTIFFS are and were at all times relevant hereto citizens of a state different from DEFENDANTS.

24.     This Court has personal jurisdiction over DEFENDANTS, as they conduct substantial business in California. Defendant CARNIVAL, by and through its subsidiary, PRINCESS, markets cruise vacations to California residents. Both maintain a headquarters in Santa Clarita, California, and employ thousands of California residents to work there. Moreover, the claims asserted herein arise from DEFENDANTS' contacts with California. Each of these facts independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over DEFENDANTS, and/or each of them, permissible under traditional notions of fair play and substantial justice.

25.     Additionally, each of the DEFENDANTS, purports to be a party to the Passage Contract, which purports to name the Central District of California as proper venue for actions against DEFENDANTS. PLAINTIFFS, however, do not concede the enforceability of the Passage Contract. Nevertheless, by naming this District as a proper venue, DEFENDANTS have consented to personal jurisdiction in this District.

26.     This Court has *in rem* jurisdiction over the *Grand Princess* which has been docked or moored in the San Francisco Bay almost continuously from March 4, 2020 through April 7, 2020.  Both passenger cruises at issue herein were roundtrips that departed from and ultimately arrived in San Francisco. The *Grand Princess* was last known to be in a holding pattern off the coast of Southern California.[8]

---

[8] https://www.vesselfinder.com/vessels/GRAND-PRINCESS-IMO-9104005-MMSI-310327000. (Last accessed April 30. 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

IV.   **VENUE**

27.   Venue in the Central District of California is proper under 28 U.S.C. section 1391 because DEFENDANTS are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

28.   Without conceding the enforceability of the Passage Contract, PLAINTIFFS acknowledge that DEFENDANTS included in the Passage Contract a venue selection provision designating the United States District Court for the Central District of California in Los Angeles as a proper venue for this action.

V.   **FACTUAL ALLEGATIONS**

A.   **THE CRUISE SHIP INDUSTRY RAKES IN MASSIVE PROFITS BY SELLING LUXURY TRAVEL TO AMERICANS**

29.   Today's CARNIVAL grew out of Carnival Cruise Lines, a cruise line formed in 1972 by Israeli business magnate Ted Arison. Operations began with a single cruise ship, and rapidly expanded on the strength of Arison's vision of rebranding and marketing luxury cruises to a vacation option accessible to the general public. Arison gained full control of the company in 1974.  By 1987, Carnival evolved into the industry leader and went public.

30.   Expansion continued thereafter, spurred on by major acquisitions. CARNIVAL acquired the Holland America Line in 1989, Seabourn in 1992, top European cruise line Costa Cruises in 1997, and the Cunard Line in 1998. Then in April 2003, CARNIVAL merged with P&O Princess Cruises plc, thereby bringing within the CARNIVAL corporate ambit the additional Princess, P&O Cruises, P&O Cruises Australia, AIDA Cruises, Ocean Village, and Swan Hellenic cruise lines.

31.   CARNIVAL operates "nine cruise lines with over 102 ships, carr[ies] 12 million passengers annually, and the corporation represents 50% of the global cruise market." [9]

---

[9] https://www.carnivalcorp.com/corporate-information/mission-and-history (last accessed May 4, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

32.    As CARNIVAL itself acknowledges, this extraordinary degree of consolidation is not readily apparent. As stated on its website, "Carnival's unprecedented rise to the world's largest cruise operator can be attributed to its ability to manage brand autonomy, with each major cruise line maintaining separate sales, marketing and reservation offices, as well as through the industry's most aggressive shipbuilding program."[10]

33.    The scope of CARNIVAL's operations is massive. CARNIVAL bills itself as "the world's largest leisure travel company" and trumpets its status as "among the most profitable and financially strong in the cruise and vacation industries." In Fiscal Year 2019 CARNIVAL's operations reaped over $20.8 billion in revenue and generated nearly $3 billion in profit.[11]

34.    As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But 3 players - Carnival Corporation & PLC, Royal Caribbean Cruises LTD, and Norwegian Cruise Line HLD - control[led] roughly 75% of the market."[12] "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018."

35.    "In 2011, three-quarters of the nearly 16 million cruise bookings worldwide were made from the United States, according to the industry group Cruise Lines International Association, which represents 26 cruise lines, including the world's largest, Carnival and Royal Caribbean."[13]

36.    And "[i]n 2018, 28.5m [million] passengers — the bulk of them from America — spent more than $46B [billion] on cruises globally."[14]

---

[10] *Id.*
[11] Carnival Corp. & plc 2019 Annual Report, p.1.
[12] https://thehustle.co/the-economics-of-cruise-ships/
[13] https://www.cnn.com/2013/02/13/opinion/walker-cruise-ships/index.html
[14] https://thehustle.co/the-economics-of-cruise-ships/

**B.  DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS AND DEADLY BEFORE BOARDING THE GRAND PRINCESS IN SAN FRANCISCO**

37.  The cruise industry has a well-documented problem with the spread of disease on board cruise ships, so much so that the United States Centers for Disease Control and Prevention (CDC) maintains a Vessel Sanitation Program to inspect cruise ships and report and track onboard viral outbreaks.

38.  Since 1994, PRINCESS cruise ships have hosted over 50 outbreaks of norovirus and other pathogens, and other CARNIVAL lines have experienced countless others.



15

39.  CARNIVAL'S website also touts its Health, Environmental, Safety, Security, and Sustainability Policy, highlighting that CARNIVAL and its operating lines (including PRINCESS) "are committed to protecting the health, safety, and security of our passengers, guests, employees, and all others working on our behalf,

---

15 *Grand Princess* – The Atrium - https://www.cruisecritic.com/photos/ships/grand-princess-54/member-8/36093/ (Last accessed May 15, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

thereby promoting an organization that always strives to be free of injuries, illness and loss." [16]

40.    CARNIVAL confirms this commitment on its website, offering the following assurance on a page bearing the caption, "Carnival's Commitment to Guest and Crew Health":

> *Carnival Cruise Line's highest responsibilities include the health and safety of our guests and crew. Coronavirus is a fluid situation and we continue to work closely with public health experts and the Cruise Lines International Association (CLIA), to monitor, screen and implement best practices to protect the health of our guests and crew as it relates to COVID-19 (coronavirus). Our monitoring, screening and operational protocols are designed to be flexible so that we can effectively adapt to changes as they occur.* [17]

41.    CARNIVAL and/or PRINCESS also employ Dr. Tarling, who is touted as an expert on policies and procedures to prevent the spread of communicable diseases on CARNIVAL'S more than 100 cruise ships.  Dr. Tarling is responsible for public health concerns for CARNIVAL and PRINCESS as Group Senior Vice President and Chief Medical Officer, to serve in that capacity for both companies.  He is a medical doctor and according to the website, "earned an Executive Master of Public Health degree in Health Care Management and Policy, and Global Health certification from [UCLA]." In addition, in "2016, he was elected for a second, four-year term as Chair and Chair-Elect of the Cruise Ship Medicine Section of the American College of Emergency Physicians.  In that role, he vigorously championed best-practice healthcare guidelines that have been adopted by the Cruise Line International Association (CLIA) whose members represent 95% of the world's cruise

---

[16] https://www.carnivalplc.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last accessed May 1, 2020).

[17] https://www.carnival.com/health-and-sailing-updates (last accessed May 1, 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

lines." According to Dr. Tarling, a ship's medical facility is not a first-aid clinic. "Each ship's modern medical center has a physical infrastructure that allows provision of a broad range of both ambulatory care services and inpatient hospital services, including an ICU. It has a self-contained pharmacy, lab and imaging, which is staffed by a small physician-led clinical team." He oversees about 800 clinical staff working at sea who are supported by about 50 staff in the U.S. between Los Angeles, Miami, and Seattle.[18]

42.    The Coronavirus now known as SARS-CoV-2 is believed to have first appeared in Wuhan, Hubei Province within the People's Republic of China in December 2019.

43.    National Geographic reported on February 18, 2020, that "[f]or most patients, COVID-19 begins and ends in their lungs, because like the flu, coronaviruses are respiratory diseases."[19] And labeled respiratory failure as "the defining signature of severe cases".

44.    CNN reported on February 19, 2020, regarding the results of the most extensive and comprehensive study of the Coronavirus performed by China's CDC and published in *The Chinese Journal of Epidemiology* two days prior. "**It found that the novel coronavirus is more contagious than the related viruses which cause SARS and MERS**. **While the resulting disease, Covid-19, is not as fatal on a case-by-case basis, its greater spread has already led to more deaths than its related coronaviruses**."[20] "**Because the Covid-19 virus has infected far more people than the viruses that caused SARS and MERS, the number of people who have died from it so far has already overtaken both viruses.**"[21]

---

[18] https://americanhealthcareleader.com/2018/how-grant-tarling-navigates-healthcare-for-8-million-travelers/ (last accessed May 14, 2020).

[19] https://www.nationalgeographic.com/science/2020/02/here-is-what-coronavirus-does-to-the-body/#close

[20] https://www.cnn.com/2020/02/19/health/coronavirus-china-sars-mers-intl-hnk/index.html

[21] *Id.*

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

45.     On February 20, 2020, NPR reported "[m]ore than 75,000 COVID-19 cases have been confirmed worldwide, according to a disease-tracking dashboard created by the Johns Hopkins Whiting School of Engineering. The virus has killed more than 2,000 people … ."[22]   The same article reported that "[t]he number of confirmed COVID-19 cases in South Korea has doubled in just 24 hours, to 104 from 51" according to the Korea Centers for Disease Control and Prevention.

46.     Any lingering doubt about the direct and specific danger the coronavirus posed to cruise ships went away with the highly publicized outbreak aboard the Diamond Princess, another of DEFENDANTS' cruise ships several weeks earlier. The Diamond Princess had been under quarantine in Yokohama, Japan since February 3, 2020.  As of February 20, it was reported that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." At the time of that reporting, "**[a] total of 634 people from the Diamond Princess have tested positive for COVID-19**, and **more than half that number are identified as "asymptomatic pathogen carriers," meaning that while they don't show signs of the illness, they can still transmit the disease to others or become sick themselves**."[23] An NPR article reporting on the tragedy also stated: "When passengers test positive for the novel coronavirus, they're taken off the Diamond Princess and sent to local hospitals. **Those diagnoses also reset the 14-day quarantine period** *for their traveling partners and close contacts*."[24]

47.     Accordingly, the United States CDC issued the following Media Statement regarding the Diamond Princess outbreak on February 18, 2020:

> *CDC believes the rate of new reports of positives new on board, especially among those without symptoms, highlights*

---

[22] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi
[23] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi
[24] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi

*the high burden of infection on the ship and the potential for*
*ongoing risk.*

48. Nevertheless, DEFENDANTS, and/or each of them, disregarded this crucial information when knowingly faced with another likely COVID-19 positive passenger on a different cruise ship—the *Grand Princess*.

### C. DEFENDANTS WERE MADE AWARE THAT A PRIOR PASSENGER ON THE GRAND PRINCESS HAD LIKELY ARMED THE SHIP WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS PRIOR TO BOARDING NEW PASSENGERS IN SAN FRANCISCO

49. Prior to February 21, 2020, the *Grand Princess* had been on a roundtrip cruise from San Francisco to Mexico. The Mexico cruise departed from San Francisco on February 11, 2020, and was scheduled to return to San Francisco on February 21, 2020, when the *Grand Princess* was scheduled to off-load some passengers and on-board some new passengers, then set sail to Hawaii.

50. Dr. Tarling admitted that a passenger aboard the earlier *Grand Princess* Mexico cruise fell ill within "two or three days" of boarding the ship, and that the timing of when the passenger's symptoms first appeared indicates he brought the Coronavirus onboard when he boarded the ship on February 11, 2020.[25] Dr. Tarling added that while onboard, the passenger had a "six-to-seven day history of symptoms of acute respiratory illness."[26]

51. As a result, "The U.S. Coast Guard is now investigating whether Carnival violated a federal law that requires ships approaching U.S. ports to report outbreaks of illness to the Coast Guard and, in certain cases, to the CDC. The rules are specific, defining a fever as a temperature of 100.4 degrees Fahrenheit or higher, as well as

---

[25] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020.
[26] "Cruises Set Sail Knowing the Risk," The Wall Street Journal, May 2, 2020.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

anyone who reports feeling feverish."[27]   That CARNIVAL passenger died in Placer County, California on March 4, 2020.

52.     On February 20, 2020, the infected passenger aboard the *Grand Princess* visited that cruise ship's medical center to seek treatment for symptoms including "acute respiratory distress." Medical personnel aboard the ship, as well as responsible executives at CARNIVAL, PRINCESS,  and TARLINE, knew or should have known that the symptoms were consistent with those suffered by passengers infected with SARS-Cov-2 aboard the *Diamond Princess* and others infected by the Coronavirus around the world, as reported widely in medical circles and the popular press.

53.     Given the highly contagious nature of SARS-CoV-2, as well as the previous experience of the outbreak then in progress aboard the *Diamond Princess,* the revelation that a passenger on the *Grand Princess* was exhibiting identical symptoms created in CARNIVAL, PRINCESS and Dr. Tarling an immediate duty to warn other passengers, isolate the passengers and the general public from an immediate threat to their health, suspend all activities of the cruise ship until such time as it could be properly disinfected and decontaminated, and report the illness to a U.S. Quarantine Station overseen by the CDC's Division of Global Migration and Quarantine (DGMQ) pursuant to 42 CFR § 71.21. The DGMQ maintains a U.S. Quarantine Station in San Francisco, the destination of the *Grand Princess.* Nevertheless, CARNIVAL, PRINCESS and Dr. Tarling disregarded their duty and did none of those things.

54.     Instead, on February 21, 2020, DEFENDANTS, and/or each of them, decided to disregard the deadly nature of the *Grand Princess* and its foreseeably lethal environment for passengers due to the cruise ship's exposed surfaces, prior passengers, and crew members being armed with COVID-19, and pursue substantial profits by boarding new passengers on the *Grand Princess* for a voyage to Hawaii.

[27] *Id.*

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Notably, 62 of the original passengers from the Mexico cruise, and over 1,000 crew members, remained aboard for the voyage to Hawaii.

> **D. DESPITE KNOWING THE GRAND PRINCESS WAS ARMED WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS BOARDED THE SHIP AND FAILED TO TAKE ANY SAFETY PRECAUTIONS OR WARN PASSENGERS**

55.     DEFENDANTS, and/or each of them, failed to take any safety precautions prior to and/or at the time of boarding passengers on the Hawaii-bound roundtrip *Grand Princess* cruise.

56.     DEFENDANTS did not take measures to disinfect, sanitize, and/or decontaminate the *Grand Princess* ship and/or exposed surfaces prior to boarding passengers, including PLAINTIFFS, in San Francisco.

57.     DEFENDANTS, and/or each of them, failed to warn, advise, and/or provide notice to the Hawaii-bound passengers prior to and/or at the time of boarding in San Francisco on February 21, 2020, that an ill passenger suffering from symptoms consistent with Covid-19 had been aboard.

58.     DEFENDANTS, and/or each of them, failed to subject any of the 62 passengers or 1,000 crew members, who had traveled on the Grand Princess with the infected passenger for approximately seven days prior and who were planning to continue their trip to Hawaii with the new passengers, to any additional or enhanced medical or health screening procedures, including a COVID-19 test.

59.     DEFENDANTS, and/or each of them, failed to provide passengers, including PLAINTIFFS, with masks at the time of boarding in San Francisco and/or failed to implement any safety procedures for socializing on the cruise ship during travel, including social distancing and/or staying six feet apart from other unknown travelers.

60.     DEFENDANTS, and/or each of them, proceeded as if everything was normal and nothing had changed, and the *Grand Princess* departed as scheduled on February 21, 2020.

### E.   DEFENDANTS DID THIS BECAUSE THEY MAKE THE LION'S SHARE OF THEIR PROFITS FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES

61.   As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But 3 players — Carnival Corporation & PLC, Royal Caribbean Cruises LTD, and Norweigan Cruise Line HLD — control[led] roughly 75% of the market."[28]

62.   "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018. Cruise ships make this money through two channels: Ticket sales and onboard purchases (e.g., alcoholic drinks, casino gambling, spa treatments, art auctions, and shore excursions), which passengers pay for with pre-loaded cruise cards and chip-equipped wristbands."[29]

63.   "On average, tickets account for 62% of total revenue and onboard purchases make up the remaining 38%. **Though tickets represent a majority of revenue, *onboard purchases account for the lion's share of the profit*, according to several experts**."[30]

> **As a high fixed-cost business, a cruise ship relies on getting as many passengers as possible *on the ship*** — even at fire-sale rates. **The major cruise lines will often fill each ship to 105%-110% capacity, then upsell its captive consumers on additional services.**
>
> **"They have mastered the ability to get their hands into people's pockets and to take out every last dollar,"** says Ross A. Klein, a professor at Memorial University of Newfoundland, who has closely studied the cruise ship industry. "They can almost give a cabin away for free and still make a profit."
>
> …
>
> On average, a passenger will spend $1,060 ($151/day) on a ticket and $650 ($92/day) on onboard purchases. After subtracting overhead costs,

---

[28] https://thehustle.co/the-economics-of-cruise-ships/
[29] *Id.*
[30] *Id.*

COMPLAINT

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

a ship will make out with roughly $291 in net profit per passenger, per cruise.

**That means that at full capacity, a single ship like Royal Caribbean's Symphony of the Seas might make $9.8m in revenue ($1.7m of which is profit) during one 7-day excursion.** ***That's $239k in profit per day at sea***.[31]

64. This creates an obvious financial incentive for DEFENDANTS, and/or each of them, to knowingly board passengers on a cruise ship armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket. And that is what happened here.

### F. DEFENDANTS FAILED TO WARN OR ADVISE PASSENGERS OF THE VIRUS BEING ON-BOARD THE GRAND PRINCESS UNTIL MARCH 4, 2020—OVER A WEEK AFTER BOARDING

65. MRS. WONG and MR. WONG, along with the rest of their family, were first alerted to the virus being aboard the *Grand Princess* on March 4, 2020 from a "Guest Health Advisory – Coronavirus" letter from Dr. Tarling. The letter notified passengers of potential exposure to the virus and announced that the Ensenada stop scheduled for March 5 was cancelled so the ship could return directly to San Francisco. No independent findings were reported. Both MR. and MRS. WONG were in fear about being quarantined on the ship because their cabin had no windows and they understood the air they were breathing was circulating through the ship's central ventilation system.  No mention was made of the overlapping passengers and crew from the Mexico cruise.

/ / /

/ / /

---

[31] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12



32

13    66.    On March 4, 2020, California Governor Gavin Newsom declared a state

14    of emergency regarding the Covid-19 outbreak. In an attempt to manage the crisis the

15    State of California refused to allow the Grand Princess to return to port as planned in

16    San Francisco.

17    67.    The cruise ship remained in a holding pattern for several days of political

18    negotiations that included input from the federal government in Washington before it

19    finally was permitted to land in the Port of Oakland on March 9, 2020.

20    68.    Passengers were allowed to disembark in stages, beginning on March 9,

21    2020.   MRS. WONG and Mr. Wong disembarked on March 10, and others

22    disembarked thereafter.   Passengers with symptoms were sent to Asilomar State

23    Beach and Conference Grounds for treatment, while those without symptoms went to

24    Travis Air Force Base, an hour north in Solano County, for further isolation in

25    quarantine.

26
27
28

---

32 https://thehill.com/changing-america/well-being/prevention-cures/486807-couple-still-on-grand-princess-cruise-files-1 (Last accessed May 5, 2020).





33

### G.     DEFENDANTS UNLOAD PASSENGERS TO DIE ONSHORE

69.     MRS. WONG and her husband long-planned to cruise to Hawaii aboard the *Grand Princess* to celebrate Mr. Wong's 64th birthday. The Wong's had been married for thirty-four (34) years and have one son, Benjamin.  Also joining them aboard the *Grand Princess* were MRS. WONG's sister and brother-in-law and Mr. Wong's brother, mother, sister and brother-in-law.

70.     MRS. WONG booked travel for her and her husband online though Sacramento-based travel agent Zoe's Cruise & Tours on December 20, 2019, for a total fare of $2,392.16.

71.     The February 23, 2020 birthday celebration was noted on the invoice. Per the PRINCESS Booking Confirmation, which bore the slogan "Come back new," MR. and MRS. WONG were immediately subject to an aggressive regime of cancellation penalties under which they would forfeit $400 from the very moment they purchased the tickets, 50% of the purchase price one week later, 75% as of January 24, 2020, and 100% as of February 7, 2020, two weeks from departure.

72.     Neither MRS. WONG nor MR. WONG was visibly infected or ill when they disembarked in Oakland on March 10, 2020. They were therefore sent to Travis

---

[33] https://news.sky.com/story/coronavirus-21-people-stranded-on-grand-princess-cruise-ship-test-positive-for-covid-19-11951315 (Last accessed May 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1    Air Force Base for further quarantine, along with the other passengers not exhibiting

2    symptoms.

3        73.    In the time since the *Grand Princess* departed from San Francisco bound

4    for Hawaii on February 21, 2020, landed in Oakland, and were allowed to disembark

5    for Travis Air Force Base on March 10, 2020, MRS. WONG and Mr. Wong both

6    tested positive for Covid-19.



34

18        74.    On March 15, 2020, while still in quarantine at Travis Air Force Base,

19    MR. WONG fell ill with a high fever. The following day, March 16, 2020, the fever

20    persisted, and he began coughing. At that time he was transferred to Kaiser

21    Permanente's Vallejo Medical Center hospital in Vallejo, California. MRS. WONG

22    never saw MR. WONG alive again after that date.

23        75.    That same day, March 16, 2020, MRS. WONG herself tested positive for

24    Covid-19.

---

[34] https://www.mercurynews.com/2020/03/09/photos-coronavirus-stricken-grand-princess-arrives-at-port-of-oakland/ (Last accessed May 5, 2020)

76.    On March 21, 2020, MRS. WONG was transferred to a hotel in San Carlos, California for further quarantine, over an hour away from the hospital in Vallejo where MR. WONG was undergoing treatment.

77.    On March 24, 2020, MR. WONG died at Kaiser Permanente's Vallejo Medical Center.  MRS. WONG was not permitted to see him in his final hours.

78.    On March 25, 2020, MRS. WONG was released from the hotel in San Carlos and allowed to return home.

79.    As of the date of this filing, MRS. WONG is still recovering from her Covid-19 symptoms and confined to her home in San Francisco.

80.    On May 2, 2020, The Wall Street Journal reported that according to the U.S. Department of Health and Human Services, five people on the Hawaii *Grand Princess* cruise had died and 131 passengers tested positive for Covid-19.  County officials in California as of that date had traced five Covid-19 cases to the prior *Grand Princess* Mexico cruise, including two deaths.[35]

81.    As a direct and proximate result of DEFENDANTS' negligence and gross negligence, MR. WONG has died, and MRS. WONG has been infected with SARS-CoV-2, requiring medical treatment.

82.    In addition, PLAINTIFFS were traumatized by the fear of developing Covid-19. They were confined to the *Grand Princess* as the virus attacked and infected passengers throughout the ship, and thereafter were confined at Travis Air Force Base and other locations in California as they underwent treatment and isolation in quarantine.

## H.    CARNIVAL IS NOW THE TARGET OF CONGRESSIONAL INVESTIGATION

83.    The history of CARNIVALS' disregard of the health and welfare of their passengers has not gone unnoticed as Congress looks into how so many people fell ill aboard cruise ships in the present crisis and the industry's failure to contain the spread

---

[35] "Cruises Set Sail Knowing the Risk," The Wall Street Journal, May 2, 2020.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

in time. On May 1, 2020, the Chair of the U.S. House of Representatives' Committee on Transportation and Infrastructure Peter DeFazio and the Chair of the House Subcommittee on Coast Guard and Maritime Transportation Sean Patrick Maloney summarized this history in a records request letter to CARNIVAL formally opening an inquiry.[36] In the words of the DeFazio-Maloney letter:

> *Norovirus and other communicable diseases are not new public health threats to the cruise line industry. In 2010, the World Health Organization (WHO) identified norovirus and influenza outbreaks as "the major public health challenges for the cruise industry." This assessment was made an entire decade before COVID-19 emerged on the world's stage. . . .*

> *Cruise ships are a fertile breeding ground for infectious diseases due to their environmental conditions and physical structure. "Cruise ships passengers spend prolonged periods in close proximity to other passengers and crew, facilitating the rapid spread of highly infectious agents such as influenza," the Journal of Travel Medicine reported in 2018. Today, the CDC warns: "Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships."*

84. Nevertheless, CARNIVAL, PRINCESS and Dr. Tarling disregarded this crucial information and continued their operations as though nothing had changed, and despite their vaunted commitment to help aboard their ships, continued marketing their cruises largely as before. As the DeFazio-Maloney letter noted:

> *As of April 23, 2020, none of the front facing web-pages from any of Carnival's nine affiliated cruise lines , – Carnival Cruise Line, Princess Cruises, Holland America Line,15 Seabourn, P&O Cruises (Australia), Costa Cruises, AIDA Cruises, P&O Cruises (UK), and Cunard – mentioned a single word about COVID-19, coronavirus, or the precautions these cruise lines intend to take once the CDC lifts its "No Sail Order" for cruise lines. Instead, these sites are advertising various images of couples dining and dancing, musicians entertaining, and lines of children holding hands and playing.*

---

[36] Letter to Mr. Arnold W. Donald, President and CEO, Carnival Corporation & PLC, from the Committee on Transportation and Infrastructure, U.S. House of Representatives, Washington, D.C. (May 1, 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP



37

## VI.   NOTICE

85.     Section 15(A)(i) of the Passage Contract purports to require that claimants provide notice to PRINCESS and CARNIVAL of any potential claims within six months from the date of the underlying harm before commencing litigation. PLAINTIFFS are resolute that this egregiously unfair provision is unenforceable. Nevertheless, PLAINTIFFS have complied with this requirement by providing written notice to DEFENDANTS' by overnight mail on May 21, 2020.

## VII.   CLAIMS

### FIRST CLAIM

### NEGLIGENCE

### (Against Each Defendant)

86.     PLAINTIFFS incorporate herein by reference all of the allegations in this complaint.

87.     DEFENDANTS, and/or each of them, negligently, carelessly, recklessly, and/or unlawfully boarded the Grand Princess docked in San Francisco on February

---

37 https://www.mercurynews.com/2020/03/10/watch-drone-footage-of-the-coronavirus-stricken-grand-princess-cruise-ship-as-passengers-disembark-at-the-port-of-oakland/ (Last accessed May 5, 2020)/

21, 2020 and departed therefrom for Hawaii, which served as the legal cause of injuries and damages herein suffered by PLAINTIFFS.

88.    CARNIVAL and PRINCESS, and/or each of them, participate in the marketplace as common carriers. Tickets for its cruises are marketed to the general public. In addition to a vacation, as part of the contractual relationship reached between DEFENDANTS and their customers, passengers aboard DEFENDANTS' cruise ships may reasonably expect and do expect safe passage on ocean-worthy vessels free from any known or knowable dangers or perils.

89.    Common carriers must carry passengers safely. Common carriers must use the highest care and the vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business. DEFENDANTS, and/or each of them, failed to do so here.

90.    DEFENDANTS, and/or each of them, negligently, wrongfully, unlawfully, and/or recklessly invited and boarded MR. and MRS. WONG onto the deathly cruise ship armed with COVID-19, without providing any notice, warning, or precautionary medical apparatuses, such as masks, and without imposing any safety precautions, such as social distancing, and/or imposing quarantine on prior exposed passengers and/or crew. DEFENDANTS, and/or each of them, negligently, wrongfully, unlawfully, and/or recklessly boarded passengers, including PLAINTIFFS MR. and MRS. WONG, without disinfecting, decontaminating, and/or sanitizing the exposed surfaces of the cruise ship and/or administering any COVID-19 tests or screening to any prior passengers and/or crew, leaving all new passengers, including MR. and MRS.   WONG, completely, unknowingly, and inescapably exposed to the deathly virus.

91.     DEFENDANTS, and/or each of them, had knowledge of the infectious and deathly danger posed by the Coronavirus before they allowed new passengers to board the *Grand Princess* in San Francisco on February 21, 2020, joining them with 62 prior passengers and 1,000 crew members who had traveled with and been in close contact with the infected passenger for at least seven (7) days prior.

92.     As a direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, MR. WONG died from the Coronavirus and MRS. WONG was infected.

93.     As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, Plaintiff MRS. WONG was injured in her health, strength, and activity, sustained injuries to her body and mind, all of which have caused Plaintiff great physical, mental, emotional, and nervous pain and suffering.  Plaintiff is informed and believes, and upon such information and belief alleges, that such injuries have resulted in debilitating injuries, all to her general damage in a sum according to proof.

94.     As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, Plaintiff MRS. WONG was required to, and continues to, employ physicians and other health care providers to examine, treat and care for her injuries, and have incurred, and will continue to incur, medical and incidental expenses for such examination, treatment rehabilitation and care in an amount according to proof.

95.     As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, Plaintiff MRS. WONG was gainfully employed, and/or capable of gainful employment through her education, training, and/or experience. By further reason of DEFENDANTS' wrongful conduct hereinabove alleged, Plaintiff MRS. WONG suffered a loss of income and/or a loss of earning capacity in an amount according to proof.

96.    As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, Plaintiff MRS. WONG contemporaneously perceived her husband, Plaintiff MR. WONG dying from COVID-19, and thereby suffered extreme emotional distress, including nervousness, grief, anxiety, worry, mortification, shock, indignity, apprehension, terror or ordeal, all in an amount according to proof.

97.    As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, PLAINTIFFS MRS. WONG and BEN suffered and continue to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, society, and moral support, all in an amount to be determined.

98.    As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, Plaintiff MRS. WONG incurred funeral and burial expenses, all in an amount to be determined.

99.    In doing the wrongful acts as hereinabove alleged, DEFENDANTS, and/or each of them, acted with oppression, fraud, and malice and/or with conscious and/or willful disregard for the health, safety and general welfare and rights of PLAINTIFFS. Such actions were done with malice, oppression and/or fraud and were and are despicable, shocking and offensive and entitle PLAINTIFFS to an award of punitive damages against DEFENDANTS in an amount to be determined at trial. DEFENDANTS' failure to heed the warnings of the CDC and to apply the knowledge gained from the outbreak aboard the *Diamond Princess,* decision to proceed with the *Grand Princess* cruise to Hawaii without enacting heightened health and medical screenings for all passengers and crew, without disinfecting or decontaminating the ship, and without warning PLAINTIFFS and passengers of the perils of boarding a ship armed with Coronavirus is an extreme departure from what a reasonable cruise ship owner and operator would do and reflects callousness and an extreme, willful, and outrageous disregard for the health and safety of its passengers. In all of these

decisions, DEFENDANTS were driven by profit, and chose not to expend resources for the safety and health of passengers, but rather keep them ignorant and in the dark so they would proceed to enjoy their vacation as planned and spend money on onboard purchases, where DEFEDANTS, and/or each of them, make their largest profits.

## SECOND CLAIM

### NEGLIGENCE - SURVIVOR CAUSE OF ACTION

**(Against Each Defendant)**

100.   PLAINTIFFS hereby re-allege and incorporate herein by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

101.   Prior to his death, the foregoing cause of action arose in MR. WONG's favor. Since his death, MRS. WONG has served as representative for the ESTATE OF MR. WONG and is authorized as successor in interest with respect to his interest in the property that was damaged, lost, or destroyed in this tragic incident, to pursue any and all legal claims for damages related thereto, and to recover damages for expenses incurred related to medical and/or emergency services related to this incident.

102.   At all time prior to this incident, DEFENDANTS, and/or each of them, negligently, carelessly, recklessly, and/or unlawfully acted and/or failed to act as hereinabove set forth, so as to serve as the legal cause of death to MR. WONG.

103.   As a direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove set forth, prior to MR. WONG's death, expenses were incurred for emergency and medical services.

104.   As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove set forth, MR. WONG also endured great emotional distress, pain and suffering from the COVID-19 virus and from the fear of contracting and/or dying from the virus before showing symptoms, all before eventually dying approximately four weeks later.

## VIII.     <u>PRAYER FOR RELIEF AND DEMAND FOR JURY</u>

WHEREFORE, PLAINTIFFS, on behalf of themselves and all persons similarly situated, respectfully prays that this Court grant the following relief:

1.     An injunction suspending operation of DEFENDANTS' cruise lines until such time as they are able to operate in a manner consistent with the safety, health, and well-being of passengers and crew as well as individuals on shore, requiring DEFENDANTS to notify PLAINTIFFS of any instance of any passenger on a prior cruise suffering from any communicable disease; requiring DEFENDANTS to cancel any planned cruise where there exists a known or knowable risk of an outbreak of communicable disease; and requiring DEFENDANTS to disclose any and all known or reasonably knowable risks to which future passengers will be exposed in boarding DEFENDANTS' cruise ships, including the heightened risk of disease transmission intrinsic to traveling aboard a cruise ship;

2.     For compensatory and general damages in an amount according to proof;

3.     For past and future medical, incidental, and service expenses according to proof;

4.     For pre- and post-judgment interest on all damages as allowed by the law;

5.     For costs of suit incurred herein;

6.     For attorney fees under existing law;

7.     For an award of punitive damages; and

8.     For such other and further relief as the Court may deem just and proper.

/ / /

/ / /

1

## JURY DEMAND

2

Plaintiff further demands trial by jury on all issues.

3

4

Dated: May 27, 2020                      **COTCHETT, PITRE & McCARTHY,**
                                          **LLP**

5

6

7                                         By: */s/ Nanci E. Nishimura*
                                               NANCI E. NISHIMURA
8                                              ALISON E. CORDOVA

9

10

11

Dated: May 27, 2020                      **ANDERLINI & McSWEENEY LLP**

12

13                                        By: */s/ P. Terry Anderlini*
                                               P. TERRY ANDERLINI
14                                             CAROLINE A. REITZ

15

16

17                                        *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28