NANCI E. NISHIMURA (SBN 152621)
nnishimura@cpmlegal.com
ALISON E. CORDOVA (SBN 284982)
acordova@cpmlegal.com
JAMES G. DALLAL (SBN 277826)
jdallal@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Telephone:    (650) 697-6000
Facsimile:    (650) 697-0577

KELLY W. WEIL (SBN 291398)
kweil@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Boulevard, Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008
Facsimile: (310) 392-0111

P. TERRY ANDERLINI (SBN 44783)
tanderlini@amlawoffice.com
CAROLINE A. RIETZ (SBN 326412)
creitz@amlawoffice.com
**ANDERLINI & McSWEENEY LLP**
66 Bovet Road, Suite 285
San Mateo, California 94402
Telephone:    (650) 242-4884
Facsimile:    (650) 212-0001

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EVA YUK WAH MA WONG,** individually and as successor in interest to the **ESTATE OF RONALD WONG**; **BENJAMIN WONG**, individually and as successor in interest to the **ESTATE OF RONALD WONG**; and the **ESTATE OF RONALD WONG**, <br><br> Plaintiffs, <br><br> v. <br><br> **CARNIVAL CORPORATION & PLC,** a Bermuda Corporation; and **PRINCESS CRUISE LINES, LTD.,** a Bermuda Corporation, <br><br> Defendants. | CASE NO:  2:20-cv-04727-DMG-JC <br><br> **FIRST AMENDED COMPLAINT for:** <br><br> **1. NEGLIGENCE – PERSONAL INJURIES AND WRONGFUL DEATH** <br><br> **2. NEGLIGENCE – SURVIVAL ACTION** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

# **TABLE CONTENTS**

**PAGE NO.**

I.      **INTRODUCTION** ............................................................................................. 1

II.     **THE PARTIES** ................................................................................................. 5

     A.    PLAINTIFFS ............................................................................................ 5

     B.    DEFENDANTS ........................................................................................ 5

     C.    ALTER EGO, AGENCY & JOINT VENTURE .................................... 7

III.    **JURISDICTION** ............................................................................................ 12

IV.    **VENUE** ........................................................................................................... 13

V.     **FACTUAL ALLEGATIONS** ....................................................................... 14

     A.    THE CRUISE SHIP INDUSTRY RAKES IN MASSIVE PROFITS BY SELLING LUXURY TRAVEL TO AMERICANS ......................... 14

     B.    DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS AND DEADLY BEFORE BOARDING THE *GRAND PRINCESS* IN SAN FRANCISCO .................................... 16

     C.    DEFENDANTS WERE MADE AWARE THAT A PRIOR PASSENGER ON THE *GRAND PRINCESS* HAD LIKELY ARMED THE SHIP WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS PRIOR TO BOARDING NEW PASSENGERS IN SAN FRANCISCO ................................................................... 20

     D.    DESPITE KNOWING THE *GRAND PRINCESS* WAS ARMED WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS BOARDED THE SHIP AND FAILED TO TAKE ANY SAFETY PRECAUTIONS OR WARN PASSENGERS ............................. 22

     E.    DEFENDANTS DID THIS BECAUSE THEY MAKE THE LION'S SHARE OF THEIR PROFITS FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES ......................... 23

     F.    DEFENDANTS FAILED TO WARN OR ADVISE PASSENGERS OF THE VIRUS BEING ON-BOARD THE GRAND PRINCESS UNTIL MARCH 4, 2020—OVER A WEEK AFTER BOARDING ......................................................... 24

     G.    DEFENDANTS UNLOAD PASSENGERS TO DIE ONSHORE ......... 28

     H.    CARNIVAL IS NOW THE TARGET OF CONGRESSIONAL INVESTIGATION ............................................. 30

VI.    **NOTICE** ......................................................................................................... 32

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**VII.  CLAIMS** ............................................................................................................ **32**

    FIRST CLAIM
    NEGLIGENCE – PERSONAL INJURIES AND WRONGFUL DEATH
    (Against Each Defendant) ....................................................................................... 32

    SECOND CLAIM
    NEGLIGENCE – SURVIVAL ACTION
    (Against Each Defendant) ....................................................................................... 37

**VIII.  PRAYER FOR RELIEF AND DEMAND FOR JURY** .................................... **39**

PLAINTIFFS EVA YUK WAH MA WONG ("MRS. WONG"), individually, and surviving spouse of RONALD WONG ("MR. WONG"), deceased, and as successor in interest to the ESTATE OF RONALD WONG, and BENJAMIN WONG ("BEN"), in his individual capacity as surviving son of RONALD WONG and successor in interest to the ESTATE OF RONALD WONG (collectively hereinafter "PLAINTIFFS") bring this action for personal injuries and wrongful death against DEFENDANTS **PRINCESS CRUISE LINES, LTD. (**"PRINCESS"**),** and **CARNIVAL CORPORATION & PLC (**"CARNIVAL"**),** (collectively hereinafter "DEFENDANTS").

## I.   <u>INTRODUCTION</u>

1.     When MR. and MRS. WONG boarded the *Grand Princess* cruise ship in San Francisco, California on February 21, 2020, neither of them had any knowledge, notice, and/or warning that they were boarding a cruise ship armed with a super virus known to be highly contagious, kill at-risk populations quickly, and have no cure— SARS-CoV-2, the novel coronavirus that causes COVID-19.

2.     Yet DEFENDANTS CARNIVAL and PRINCESS, and/or each of them and their managing agents, including Dr. Grant Tarling, the Chief Medical Officer, knew or should have known that a prior passenger on board the vessel was infected with the coronavirus and had been experiencing severe respiratory symptoms associated with COVID-19 for the past seven (7) days while traveling on the *Grand Princess*, resulting in the entire ship and crew being exposed to and potential carriers of the highly contagious and deadly virus, all immediately prior to the *Grand Princess* docking in San Francisco, California, to offload some passengers and pick up others on February 21, 2020.

3.     Yet DEFENDANTS, and/or each of them, negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of their passengers, invited and boarded MR. and MRS. WONG onto the deadly cruise ship armed with COVID-19 without providing any notice, warning, or precautionary

medical apparatuses, such as masks, and without imposing any safety precautions, such as social distancing, and/or imposing quarantine on prior exposed passengers and/or crew. DEFENDANTS, and/or each of them, also negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of its passengers, failed to disinfect, decontaminate, and/or sanitize the exposed surfaces of the cruise ship prior to boarding MR. and MRS. WONG and failed to administer any coronavirus tests to any prior passengers and/or crew, leaving all new passengers, including MR. and MRS. WONG, completely, unknowingly, and inescapably exposed to the deadly virus.

4.      DEFENDANTS, and/or each of them, had knowledge of the infectious and deadly danger posed by the Coronavirus before they allowed new passengers to board the *Grand Princess* in San Francisco on February 21, 2020, joining them with 62 prior passengers and 1,000 crew members who had traveled with and been in close contact with the infected passenger for at least seven (7) days prior.

5.      In fact, another of DEFENDANTS' cruise ships, the *Diamond Princess,* had been under quarantine at Yokohama's port near Tokyo, Japan since February 3, and as of February 20, 2020, the global press was reporting that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." And further, "**[a] total of 634 people from the Diamond Princess have tested positive for COVID-19**, the Japanese agency said. **More than half that number are identified as 'asymptomatic pathogen carriers,' meaning that while they don't show signs of the illness, they can still transmit the disease to others or become sick themselves**."[1] An NPR article reporting on the tragedy also stated: "When passengers test positive for the novel coronavirus, they're taken off the Diamond Princess and

---

[1] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi

sent to local hospitals. **Those diagnoses also reset the 14-day quarantine period *for their traveling partners and close contacts*.**"[2]

6.     Prior to February 21, 2020 when PLAINTIFFS MR. & MRS. WONG boarded the *Grand Princess*, COVID-19 had killed over 2,000 people and there were over 75,000 cases reported worldwide."[3]

7.     Dr. Tarling later reported "the company believed the virus was brought aboard the *Grand Princess* by a passenger on a previous cruise" who embarked for Mexico on February 11 and disembarked on February 21, but had reported to medical professionals on the cruise ship that he "had fallen ill around two or three days after boarding the ship."[4]   The afflicted passenger aboard the *Grand Princess* sought medical treatment from the ship's medical center on February 20, but DEFENDANTS, and/or each of them, took **no action** upon the ship's arrival back in San Francisco the following day.

8.     According to industry experts, commercial cruise ship companies make money in two ways: tickets sales and on-board purchases. While tickets represent a majority of revenue for these companies, **_onboard purchases account for the lion's share of the profit_**.[5] This dynamic creates an obvious financial incentive for the officers, directors, and/or managing agents of DEFENDANTS to knowingly board passengers on a cruise ship armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket.

9.     Further, Dr. Tarling knows (and at all relevant times knew) about the virulent nature of infectious diseases.  DEFENDANT CARNIVAL touts his 27 years of experience overseeing the health and welfare of 12 million passengers annually and thousands of crew members aboard CARNIVAL'S 104 cruise ships across its nine

---

[2] *Id.*
[3] *Id.*
[4] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020.
[5] *Id.*

cruise lines.  DEFENDANTS promote Dr. Tarling as a medical expert who is internationally recognized in the cruise industry for developing and implementing policies and procedures to protect global travelers:

> *Dr. Tarling is also charged with developing and implementing research-based public health policies and procedures that protect large populations of global travelers.  His expertise is routinely called upon by national and international health authorities to help develop prevention and control measures to mitigate the global spread of communicable diseases such as Zika, Ebola, MERS, Chikungunya, Legionella, noroviruses and novel influenza viruses.[6]*



The coronavirus-stricken Grand Princess cruise ship docked in San Francisco, Calif., on April 7, 2020.
MediaNews Group/East Bay Times v/MediaNews Group via Getty Images

/ / /

/ / /

---

[6] https://www.princess.com/news/notices_and_advisories/notices/dr-grant-tarling-chief-medical-officer.html

4

## II.    THE PARTIES

### A.    PLAINTIFFS

10.    Plaintiff **Eva Yuk Wah Ma Wong** ("MRS. WONG") is, and at all times relevant to this Complaint was, a resident of the City and County of San Francisco, California. MRS. WONG was a ticketed passenger who boarded the *Grand Princess* cruise on February 21, 2020 in San Francisco. MRS. WONG is also the surviving spouse of MR. WONG, and is a proper successor in interest and beneficiary pursuant to California law and admiralty law. *See* Cal. Civ. Proc. Code § 337.30; 46 U.S. Code § 30302.  By virtue of the premises, MRS. WONG is lawfully entitled to initiate this Amended Complaint in her individual capacity, as well as a successor in interest and beneficiary on behalf of the ESTATE OF RONALD WONG in pursuit of a survival action.  Additionally, MRS. WONG has standing to bring a wrongful death claim for the loss of her husband pursuant to Cal. Civ. Proc. Code § 337.60(a).

11.    Plaintiff **Ronald Wong** ("MR. WONG"), now deceased, was at all times relevant to this Complaint a resident of the City and County of San Francisco, California. MR. WONG was a ticketed passenger who boarded the *Grand Princess* cruise on February 21, 2020 in San Francisco.

12.    Plaintiff **Benjamin Wong** ("BENJAMIN WONG") is, and at all times relevant to this Complaint was, a resident of the City and County of San Francisco, California.  BENJAMIN WONG has standing to bring a wrongful death claim for the loss of his father pursuant to Cal. Civ. Proc. Code § 337.60(a).

### B.    DEFENDANTS

13.    Defendant **Carnival Corporation & PLC** ("CARNIVAL") is a dual-listed company operating as two fully integrated entities, Carnival Corporation and Carnival plc. Carnival Corporation was incorporated in Panama in 1972. Carnival plc was incorporated in Wales, United Kingdom in 2000. As described by CARNIVAL in a filing with the U.S. Securities and Exchange Commission (SEC), "Carnival Corporation and Carnival plc operate a dual listed company ('DLC'), whereby the

businesses of Carnival Corporation and Carnival plc are combined through a number of contracts and through provisions in Carnival Corporation's Articles of Incorporation and By-Laws and Carnival Plcs's Articles of Association." Carnival Corporation and Carnival plc operate as a single economic enterprise and share a senior executive management team and identical Boards of Directors. The dual-listed company has its headquarters in Miami, Florida. This lawsuit is being brought against the dual-listed company and/or Carnival Corporation (collectively, "CARNIVAL").

14.    Defendant **Princess Cruise Lines LTD** ("PRINCESS") is incorporated in Bermuda, with its headquarters in Santa Clarita, California. Santa Clarita serves as the nerve center for PRINCESS, and all major decisions regarding operation of its cruise ships are made with the input of PRINCESS executives whose offices are located at the PRINCESS headquarters in Santa Clarita, California.

15.    At all times hereto, PRINCESS and CARNIVAL advertised, marketed, sold, and profited (directly or indirectly) from, and controlled and operated the cruise ship *Grand Princess*.

16.    CARNIVAL and PRINCESS are collectively referred to herein as "CARNIVAL" or "DEFENDANTS."

/ / /

/ / /

7

## C.    ALTER EGO, AGENCY & JOINT VENTURE

17.    DEFENDANTS PRINCESS and CARNIVAL are alter egos of each other such that the corporate form should be disregarded.

18.    At all times herein mentioned, DEFENDANTS, and/or each of them, hereinabove, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other DEFENDANTS named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each DEFENDANT has ratified and approved the acts of each of the remaining DEFENDANTS.  Each of the DEFENDANTS aided and abetted, encouraged, and rendered substantial assistance to the other DEFENDANTS in breaching their obligations to PLAINTIFFS, as alleged herein.  In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, as alleged herein, each of the DEFENDANTS acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would

---

[7] Princess Cruises headquarters in Santa Clarita, California.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

19.    CARNIVAL has ownership and control over PRINCESS, which is organized under Holland America Group within Carnival Corporation & plc. CARNIVAL acknowledges in filings with the SEC that PRINCESS is a wholly-owned subsidiary.[8]

20.    CARNIVAL exerts dominion and control over PRINCESS's business and day-to-day operations as the parent company of PRINCESS, which CARNIVAL refers to as a "Carnival Brand" cruise line and part of CARNIVAL'S "portfolio of leading global, regional and national cruise brands."[9]

21.    The CARNIVAL Board of Directors is empowered to make decisions governing the operation of PRINCESS, and PRINCESS appears to make use of CARNIVAL assets in conducting cruise operations. CARNIVAL has the right to choose the officers of PRINCESS. PRINCESS does not have its own independent board of directors. CARNIVAL could, if it chose, dissolve and wind up PRINCESS on its own initiative regardless of any contrary desire not to do so on the part of PRINCESS or any of the officers of PRINCESS.

22.    Among the shared officers of CARNIVAL and PRINCESS is Dr. Grant Tarling, who by his own admission serves as "Senior Vice President and Chief Medical Officer" for five cruise lines owned by CARNIVAL, including PRINCESS, Carnival Cruise Line, Carnival Australia, Seabourn, and Holland America.[10] It is implausible that Dr. Tarling could function in this five-way management position absent direction by direction and coordination by CARNIVAL.

---

[8] *See* Carnival Corporation Form 10-K ("Carnival 10-K") for the Fiscal Year Ended November 30, 2019, pp. 8, 10-11.
[9] Carnival Corporation & plc 2019 Annual Report, p. 1.
[10] Public LinkedIn profile of Dr. Grant Tarling, available at https://www.linkedin.com/in/grant-tarling/ (last accessed Sept. 12, 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

23.     The decisions to suspend operations of PRINCESS cruises, and the decisions to continue operations prior to the ultimate decisions to suspend, were taken by PRINCESS President Jan Swartz with input from Dr. Tarling and under the oversight and in consultation with senior CARNIVAL leadership who had the ultimate say, including CARNIVAL President & CEO Arnold W. Donald. In prominent interviews Ms. Swartz and Mr. Donald have sought to defend the actions of PRINCESS and CARNIVAL as the pandemic crisis unfolded, thereby acknowledging their direct involvement in such decisions, and also ratifying them. CARNIVAL spokesperson Roger Frizell expressly noted that CARNIVAL did not view itself as obligated to follow CDC guidelines.[11]CARNIVAL totally dominates and controls PRINCESS, as it does with each of CARNIVAL's eight other cruise line subsidiaries. CARNIVAL controls, operates, harmonizes, and coordinates the activities of PRINCESS and the other eight cruise line subsidiaries for the maximum benefit of CARNIVAL and its shareholders. CARNIVAL is empowered to dictate to PRINCESS where to operate, what volume of cruises to offer or passengers to service in a given market, whether to invest in new routes, nor whether to continue or suspend services. PRINCESS does not operate without authorization from its corporate parent, CARNIVAL.

24.     According to its 2019 Annual Report, CARNIVAL has a single integrated operating budget for all of its cruise operations including all nine of its cruise lines. There are no separate books for PRINCESS. There is not even a single separate line item reflecting the separate operations and performance of PRINCESS. Consolidated financials are reported not by cruise line, but through a geographic sectoral approach that differentiates between the North America and Australia ("NAA") segment and Europe and Asia ("EA") segment, and then adds figures for

---

[11] A. Carr & C. Palmieri, "Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going," *Bloomberg BusinessWeek,* April 16, 2020, available at*: https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/* (last accessed Sept. 14, 2020).

"Cruise Support" and "Tour and Other." These figures are not broken down to reveal the separate performance of PRINCESS or any of the other CARNIVAL lines. The cruise lines are not deemed relevant for shareholder analysis or from the perspective of operating the integrated CARNIVAL business.[12]

25.     To the extent assets are assigned to or held by PRINCESS if at all, such activity is controlled and dictated by CARNIVAL. PRINCESS does not have the right to retain its own profits. CARNIVAL may freely assign assets and funding among its subsidiaries including by assigning them to or removing them from control of PRINCESS. Transactions between CARNIVAL and PRINCESS and between and among PRINCESS and the other subsidiaries of CARNIVAL are not true arm's length agreements and are for the benefit of and at the direction of CARNIVAL, to the exclusion of advancing any independent interest of PRINCESS or any of the other CARNIVAL subsidiaries.

26.     CARNIVAL's 2019 Annual Report discloses "Capital expenditures of $3.8 billion for our ongoing new shipbuilding program," without differentiating among the cruise lines who will be operating the cruise ships once built. The Annual Report also refers to a single "shipbuilding contract" and lists currency risk associated with the new PRINCESS-operated *Enchanted Princess* on the same table of figures as the new Carnival Cruise Lines-operated *Mardi Gras.*[13] Sales of ships are reported without reference to cruise line affiliation; for sold ships CARNIVAL reports only the passenger capacity and whether the ship is in the NAA segment or EA segment.[14]

27.     Public investors cannot invest separately in PRINCESS, which has no publicly traded stock of its own.  Rather, investors must invest in the dual-listed CARNIVAL, in either Carnival Corporation (CCL) or Carnival plc (CUK) on the New York Stock Exchange or in Carnival plc (CCLL) on the London Stock Exchange. There are no public shares of PRINCESS available to trade because PRINCESS is

---

[12] *Id.* at 29 n.11, "Segment Information."
[13] *Id.* at 28; 59-60.
[14] *Id.* at 17.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

owned and controlled entirely by CARNIVAL and is a mere instrumentality of CARNIVAL.[15]

28.    Following the Federal Reserve's decision to increase the size of its lending program and thereby enable hedge funds to buy up corporate bonds at much lower interest rates, CARNIVAL has shored up its finances via a massive infusion of nearly $6 billion in cash. CARNIVAL is therefore well-capitalized despite the suspension of operations at all nine of its cruise lines.[16]

29.    The same may not be true for PRINCESS, however. PRINCESS suspended operations as of March 12 and still cannot operate legally under current government orders, and therefore has not had access to its usual source of revenue.[17]

30.    PRINCESS has also been the hardest hit of the CARNIVAL cruise lines and perhaps of all cruise lines globally by the pandemic, as PRINCESS has this year faced coronavirus outbreaks aboard the *Diamond Princess, Ruby Princess,* and *Coral Princess* in addition to the *Grand Princess* cruises at issue here. While over 40 cruise ships have experienced coronavirus outbreaks during the pandemic, four have been PRINCESS cruise ships, and those four include the three causing the most deaths among all cruise ships globally. As of this date, of 88 known fatalities resulting from cruise ship coronavirus outbreaks globally, 52 deaths have resulted from cruises

---

[15]  *See* Princess website, "For Investors" at *https://www.princess.com/aboutus/investors/index.jsp* (last accessed Sept. 12, 2020).
[16]  M. Matousek, "The Fed may have saved Carnival from having to pay over 15% interest on its new bonds," *Business Insider,* Apr. 27, 2020, available at *https://www.businessinsider.com/carnival-faced-higher-interest-rate-new-debt-before-fed-action-2020-4?op=1* (last accessed Sept. 12, 2020).
[17] C. Hansen, "Princess Cruises Suspends Service for Two Months Amid Coronavirus Pandemic," U.S. News. & World Report, Mar. 12, 2020, available at https://www.usnews.com/news/national-news/articles/2020-03-12/princess-cruises-suspends-service-for-two-months-amid-coronavirus-pandemic (last accessed Sept. 12, 2020); Centers for Disease Control and Prevention, "Quarantine and Isolation: Cruise Ship Guidance," updated July 16, 2020, available at https://www.cdc.gov/quarantine/cruise/index.html (last accessed Sept. 13, 2020) (extending government shutdown of cruise industry through September 30, 2020).

operated by PRINCESS.[18] Therefore there is a heightened but plausible risk that PRINCESS may not be able to pay out on all the claims against it to compensate for these injuries absent financial contribution from its alter ego corporate parent CARNIVAL.

31.    Meanwhile certain CARNIVAL directors and officers sold significant volumes of their CCL stock in January and February, a time when they would have appreciated the significance and severity of the pandemic in a way that the broader public and public investors would not. In particular, CARNIVAL President & CEO Arnold Donald sold 24,699 shares of CCL stock on February 14, 2020, which at a then operative share price of $42.9341 netted him a payday of some $1,060,429.34. Such transactions taking money out of the company may impact the ability of CARNIVAL and of PRINCESS to pay meritorious claims.

## III.    JURISDICTION

32.    This Court has Admiralty subject matter jurisdiction pursuant to 28 U.S.C. section 1333 as the wrongdoing alleged in this Complaint arose, occurred, and/or took effect on navigable waters and bears a significant relationship to traditional maritime activity, *i.e.,* it occurred while DEFENDANTS, who engage in the commerce of luxury cruises, boarded new passengers on the *Grand Princess* cruise ship docked in the San Francisco Bay.

33.    This Court has personal jurisdiction over DEFENDANTS, as they conduct substantial business in California. Defendant CARNIVAL, by and through its subsidiary, PRINCESS, markets cruise vacations to California residents. Both maintain a headquarters in Santa Clarita, California, and employ thousands of California residents to work there. Moreover, the claims asserted herein arise from

---

[18] *See generally* Wikipedia page on "COVID-19 pandemic on cruise ships" and sources cited therein, available at https://en.wikipedia.org/wiki/COVID-19_pandemic_on_cruise_ships (last accessed Sept. 12, 2020) (confirming 28 fatalities among passengers aboard the Ruby Princess, 14 from the Diamond Princess, 7 from the Grand Princess, and 3 from the Coral Princess).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

DEFENDANTS' contacts with California. Each of these facts independently is, but also all of these facts together are, sufficient to render the exercise of jurisdiction by this Court over DEFENDANTS, and/or each of them, permissible under traditional notions of fair play and substantial justice.

34.     Additionally, each of the DEFENDANTS purports to be a party to the Passage Contract, which purports to name the Central District of California as proper venue for actions against DEFENDANTS. PLAINTIFFS, however, do not concede the enforceability of the Passage Contract. Nevertheless, by naming this District as a proper venue, DEFENDANTS have consented to personal jurisdiction in this District.

35.     This Court has *in rem* jurisdiction over the *Grand Princess* which has been docked or moored in the San Francisco Bay almost continuously from March 4, 2020 through April 7, 2020.  Both passenger cruises at issue herein were roundtrips that departed from and ultimately arrived in San Francisco. When PLAINTIFFS initiated this action, the *Grand Princess* was last known to be in a holding pattern off the coast of Southern California.[19]

## IV.    VENUE

36.     Venue in the Central District of California is proper under 28 U.S.C. section 1391 because DEFENDANTS are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

37.     Without conceding the enforceability of the Passage Contract, PLAINTIFFS acknowledge that DEFENDANTS included in the Passage Contract a venue selection provision designating the United States District Court for the Central District of California in Los Angeles as a proper venue for this action.

---

[19] https://www.vesselfinder.com/vessels/GRAND-PRINCESS-IMO-9104005-MMSI-310327000. (Last accessed April 30. 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

## V.   FACTUAL ALLEGATIONS

### A.   THE CRUISE SHIP INDUSTRY RAKES IN MASSIVE PROFITS BY SELLING LUXURY TRAVEL TO AMERICANS

38.   Today's CARNIVAL grew out of Carnival Cruise Lines, a cruise line formed in 1972 by Israeli business magnate Ted Arison. Operations began with a single cruise ship, and rapidly expanded on the strength of Arison's vision of rebranding and marketing luxury cruises to a vacation option accessible to the general public. Arison gained full control of the company in 1974.  By 1987, Carnival evolved into the industry leader and went public.

39.   Expansion continued thereafter, spurred on by major acquisitions. CARNIVAL acquired the Holland America Line in 1989, Seabourn in 1992, top European cruise line Costa Cruises in 1997, and the Cunard Line in 1998. Then in April 2003, CARNIVAL merged with P&O Princess Cruises plc, thereby bringing within the CARNIVAL corporate ambit the additional Princess, P&O Cruises, P&O Cruises Australia, AIDA Cruises, Ocean Village, and Swan Hellenic cruise lines.

40.   CARNIVAL operates "nine cruise lines with over 102 ships, carr[ies] 12 million passengers annually, and the corporation represents 50% of the global cruise market." [20]

41.   As CARNIVAL itself acknowledges, this extraordinary degree of consolidation is not readily apparent. As stated on its website, "Carnival's unprecedented rise to the world's largest cruise operator can be attributed to its ability to manage brand autonomy, with each major cruise line maintaining separate sales, marketing and reservation offices, as well as through the industry's most aggressive shipbuilding program." [21]

42.   Based on its 2019 Annual Report, CARNIVAL is the owner of the *Grand Princess* and of all the cruise ships operated by the nine separately branded

---

[20] https://www.carnivalcorp.com/corporate-information/mission-and-history (last accessed May 4, 2020).

[21] *Id.*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

CARNIVAL cruises lines, including PRINCESS. CARNIVAL lists some $38 billion in "Property and Equipment, Net" on its consolidated balance sheets as assets of CARNIVAL, out of a grand total of $45 billion in assets.[22] Under Note 2, "Significant Accounting Policies," CARNIVAL lists "Ships" as the first category of assets within the section on "Property and Equipment."[23] Ownership of these assets forms a significant part of the basis for CARNIVAL's valuation and inducement for public investors to invest in CARNIVAL stock. As the owner of the *Grand Princess,* CARNIVAL owes a direct, non-delegable duty of care to passengers aboard the ship.

43.     The scope of CARNIVAL's operations is massive. CARNIVAL bills itself as "the world's largest leisure travel company" and trumpets its status as "among the most profitable and financially strong in the cruise and vacation industries." In Fiscal Year 2019 CARNIVAL's operations reaped over $20.8 billion in revenue and generated nearly $3 billion in profit.[24]

44.     As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But 3 players - Carnival Corporation & PLC, Royal Caribbean Cruises LTD, and Norwegian Cruise Line HLD - control[led] roughly 75% of the market."[25] "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018."

45.     "In 2011, three-quarters of the nearly 16 million cruise bookings worldwide were made from the United States, according to the industry group Cruise Lines International Association, which represents 26 cruise lines, including the world's largest, Carnival and Royal Caribbean."[26]

46.     And "[i]n 2018, 28.5m [million] passengers — the bulk of them from America — spent more than $46B [billion] on cruises globally."[27]

---

[22] Carnival Corporation & plc 2019 Annual Report, p. 7.
[23] *Id.,* pp. 10-11.
[24] *Id.*, p.1.
[25] https://thehustle.co/the-economics-of-cruise-ships/
[26] https://www.cnn.com/2013/02/13/opinion/walker-cruise-ships/index.html
[27] https://thehustle.co/the-economics-of-cruise-ships/

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.    DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS AND DEADLY BEFORE BOARDING THE *GRAND PRINCESS* IN SAN FRANCISCO

47.    The cruise industry has a well-documented problem with the spread of disease on board cruise ships, so much so that the United States Centers for Disease Control and Prevention (CDC) maintains a Vessel Sanitation Program to inspect cruise ships and report and track onboard viral outbreaks.

48.    Since 1994, PRINCESS cruise ships have hosted over 50 outbreaks of norovirus and other pathogens, and other CARNIVAL lines have experienced countless others.



**28**

49.    To assuage potential passengers' concerns about viruses on board, CARNIVAL's website also touts its Health, Environmental, Safety, Security, and Sustainability Policy, highlighting that CARNIVAL and its operating lines (including PRINCESS) "are committed to protecting the health, safety, and security of our passengers, guests, employees, and all others working on our behalf, thereby

---

[28] *Grand Princess* – The Atrium - https://www.cruisecritic.com/photos/ships/grand-princess-54/member-8/36093/ (Last accessed May 15, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

promoting an organization that always strives to be free of injuries, illness and loss."[29]

50.    CARNIVAL confirms this commitment on its website, offering the following assurance on a page bearing the caption, "Carnival's Commitment to Guest and Crew Health":

> *Carnival Cruise Line's highest responsibilities include the health and safety of our guests and crew. Coronavirus is a fluid situation and we continue to work closely with public health experts and the Cruise Lines International Association (CLIA), to monitor, screen and implement best practices to protect the health of our guests and crew as it relates to COVID-19 (coronavirus). Our monitoring, screening and operational protocols are designed to be flexible so that we can effectively adapt to changes as they occur.*[30]

51.    CARNIVAL and PRINCESS also employ Dr. Tarling, who is touted as an expert on policies and procedures to prevent the spread of communicable diseases on CARNIVAL'S more than 100 cruise ships.  Dr. Tarling is responsible for public health concerns for CARNIVAL and PRINCESS as Group Senior Vice President and Chief Medical Officer, to serve in that capacity for both companies.  He is a medical doctor and according to the website, "earned an Executive Master of Public Health degree in Health Care Management and Policy, and Global Health certification from [UCLA]." In addition, in "2016, he was elected for a second, four-year term as Chair and Chair-Elect of the Cruise Ship Medicine Section of the American College of Emergency Physicians.  In that role, he vigorously championed best-practice healthcare guidelines that have been adopted by the Cruise Line International Association (CLIA) whose members represent 95% of the world's cruise lines."

---

[29] https://www.carnivalplc.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last accessed May 1, 2020).

[30] https://www.carnival.com/health-and-sailing-updates (last accessed May 1, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

According to Dr. Tarling, the medical facilities aboard ships within the CARNIVAL family of cruise lines are not mere first-aid clinics. "Each ship's modern medical center has a physical infrastructure that allows provision of a broad range of both ambulatory care services and inpatient hospital services, including an ICU. It has a self-contained pharmacy, lab and imaging, which is staffed by a small physician-led clinical team." He oversees about 800 clinical staff working at sea who are supported by about 50 staff in the U.S. between Los Angeles, Miami, and Seattle.[31]

52.   The Coronavirus now known as SARS-CoV-2 is believed to have first appeared in Wuhan, Hubei Province within the People's Republic of China in December 2019.

53.   National Geographic reported on February 18, 2020, that "[f]or most patients, COVID-19 begins and ends in their lungs, because like the flu, coronaviruses are respiratory diseases."[32] The article labeled respiratory failure as "the defining signature of severe cases."

54.   CNN reported on February 19, 2020, regarding the results of the most extensive and comprehensive study of the Coronavirus performed by China's CDC and published in *The Chinese Journal of Epidemiology* two days prior. "**It found that the novel coronavirus is more contagious than the related viruses which cause SARS and MERS**. **While the resulting disease, Covid-19, is not as fatal on a case-by-case basis, its greater spread has already led to more deaths than its related coronaviruses**."[33] "**Because the Covid-19 virus has infected far more people than the viruses that caused SARS and MERS, the number of people who have died from it so far has already overtaken both viruses.**"[34]

---

[31] https://americanhealthcareleader.com/2018/how-grant-tarling-navigates-healthcare-for-8-million-travelers/ (last accessed May 14, 2020).
[32] https://www.nationalgeographic.com/science/2020/02/here-is-what-coronavirus-does-to-the-body/#close
[33] https://www.cnn.com/2020/02/19/health/coronavirus-china-sars-mers-intl-hnk/index.html
[34] *Id.*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

55.     On February 20, 2020, NPR reported "[m]ore than 75,000 COVID-19 cases have been confirmed worldwide, according to a disease-tracking dashboard created by the Johns Hopkins Whiting School of Engineering. The virus has killed more than 2,000 people … ."[35]   The same article reported that "[t]he number of confirmed COVID-19 cases in South Korea has doubled in just 24 hours, to 104 from 51" according to the Korea Centers for Disease Control and Prevention.

56.     Any lingering doubt about the direct and specific danger the coronavirus posed to cruise ships went away with the highly publicized outbreak aboard the *Diamond Princess,* another of DEFENDANTS' cruise ships several weeks earlier. The *Diamond Princess* had been under quarantine in Yokohama, Japan since February 3, 2020.  As of February 20, it was reported that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." At the time of that reporting, "**[a] total of 634 people from the Diamond Princess have tested positive for COVID-19**, and **more than half that number are identified as 'asymptomatic pathogen carriers,' meaning that while they don't show signs of the illness, they can still transmit the disease to others or become sick themselves**."[36] An NPR article reporting on the tragedy also stated: "When passengers test positive for the novel coronavirus, they're taken off the Diamond Princess and sent to local hospitals. **Those diagnoses also reset the 14-day quarantine period** *for their traveling partners and close contacts*."[37]

57.     Accordingly, the United States CDC issued the following Media Statement regarding the Diamond Princess outbreak on February 18, 2020:

---

[35] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi
[36] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi
[37] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi

> *CDC believes the rate of new reports of positives new on*
> *board, especially among those without symptoms, highlights*
> *the high burden of infection on the ship and the potential for*
> *ongoing risk.*

58.     COVID-19 is far more contagious and deadly than the flu. What is understood to be the incubation period between the time a person is exposed or infected with the coronavirus until that person can test positive (but be asymptomatic) varies and has changed as the science has developed. It was earlier believed that the incubation period was 14 days.  But according to a most recent report by the CDC, "typically, a person develops symptoms **5 days after being infected**, but symptoms can appear **as early as 2 days after infection** or **as late as 14 days after infection**, and the time range can vary."[38]

59.     Nevertheless, DEFENDANTS, and/or each of them, disregarded this crucial information when knowingly faced with another likely COVID-19 positive passenger on a different cruise ship—the *Grand Princess*.

## C. DEFENDANTS WERE MADE AWARE THAT A PRIOR PASSENGER ON THE *GRAND PRINCESS* HAD LIKELY ARMED THE SHIP WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS PRIOR TO BOARDING NEW PASSENGERS IN SAN FRANCISCO

60.     Prior to February 21, 2020, the *Grand Princess* had been on a roundtrip cruise from San Francisco to Mexico. The Mexico cruise departed from San Francisco on February 11, 2020, and was scheduled to return to San Francisco on February 21, 2020, when the *Grand Princess* was scheduled to off-load some passengers and on-board some new passengers, then set sail to Hawaii.

61.     Dr. Tarling admitted that a passenger aboard the earlier *Grand Princess* Mexico cruise fell ill within "two or three days" of boarding the ship, and that the

---

[38] "Similarities and Differences between Flu and COVID-19" https://www.cdc.gov/flu/symptoms/flu-vs-covid19.htm (last accessed September 10, 2020).

**FIRST AMENDED COMPLAINT; CASE NO. 2:20-CV-04727-DMG-JC**     20

timing of when the passenger's symptoms first appeared indicates he brought the coronavirus onboard when he boarded the ship on February 11, 2020.[39]  Dr. Tarling added that while onboard, the passenger had a "six-to-seven day history of symptoms of acute respiratory illness."[40]

62.   As a result, "The U.S. Coast Guard is now investigating whether Carnival violated a federal law that requires ships approaching U.S. ports to report outbreaks of illness to the Coast Guard and, in certain cases, to the CDC.  The rules are specific, defining a fever as a temperature of 100.4 degrees Fahrenheit or higher, as well as anyone who reports feeling feverish."[41]   That CARNIVAL passenger died in Placer County, California on March 4, 2020.

63.   On February 20, 2020, the infected passenger aboard the *Grand Princess* visited that cruise ship's medical center to seek treatment for symptoms including "acute respiratory distress." Medical personnel aboard the ship, as well as responsible executives at CARNIVAL and PRINCESS including Dr. Tarling, knew or should have known that the symptoms were consistent with those of passengers suffering from COVID-19 aboard the *Diamond Princess* and others infected by the coronavirus around the world, as reported widely in medical circles and the popular press.

64.   Given the highly contagious nature of SARS-CoV-2, as well as the previous experience of the outbreak then in progress aboard the *Diamond Princess,* the revelation that a passenger on the *Grand Princess* was exhibiting identical symptoms created in CARNIVAL, PRINCESS and Dr. Tarling an immediate duty to warn other passengers, isolate the passengers and the general public from an immediate threat to their health, suspend all activities of the cruise ship until such time as it could be properly disinfected and decontaminated, and report the illness to a U.S. Quarantine Station overseen by the CDC's Division of Global Migration and

---

[39] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020.
[40] "Cruises Set Sail Knowing the Risk," The Wall Street Journal, May 2, 2020.
[41] *Id.*

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Quarantine (DGMQ) pursuant to 42 CFR § 71.21. The DGMQ maintains a U.S. Quarantine Station in San Francisco, the destination of the *Grand Princess.* Nevertheless, CARNIVAL, PRINCESS and Dr. Tarling disregarded their duty and did none of those things.

65.   Instead, on February 21, 2020, DEFENDANTS, and/or each of them, decided to disregard the deadly nature of the *Grand Princess* and its foreseeably lethal environment for passengers due to the cruise ship's exposed surfaces, prior passengers, and crew members being armed with the coronavirus, and pursue substantial profits by boarding new passengers on the *Grand Princess* for a voyage to Hawaii. Notably, 62 of the original passengers from the Mexico cruise, and over 1,000 crew members, remained aboard for the voyage to Hawaii.

**D.   DESPITE KNOWING THE *GRAND PRINCESS* WAS ARMED WITH A HIGHLY CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS BOARDED THE SHIP AND FAILED TO TAKE ANY SAFETY PRECAUTIONS OR WARN PASSENGERS**

66.   DEFENDANTS, and/or each of them, failed to take any safety precautions prior to and/or at the time of boarding passengers on the Hawaii-bound roundtrip *Grand Princess* cruise.

67.   DEFENDANTS did not take measures to disinfect, sanitize, and/or decontaminate the *Grand Princess* ship and/or exposed surfaces prior to boarding passengers, including PLAINTIFFS, in San Francisco.

68.   DEFENDANTS, and/or each of them, failed to warn, advise, and/or provide notice to the Hawaii-bound passengers prior to and/or at the time of boarding in San Francisco on February 21, 2020, that an ill passenger suffering from symptoms consistent with COVID-19 had been aboard.

69.   DEFENDANTS, and/or each of them, failed to subject any of the 62 passengers or 1,000 crew members, who had traveled on the Grand Princess with the infected passenger for approximately seven days prior and who were planning to

continue their trip to Hawaii with the new passengers, to any additional or enhanced medical or health screening procedures, including a coronavirus test.

70.    DEFENDANTS, and/or each of them, failed to provide passengers, including PLAINTIFFS, with masks at the time of boarding in San Francisco and/or failed to implement any safety procedures for socializing on the cruise ship during travel, including social distancing and/or staying six feet apart from other unknown travelers.

71.    DEFENDANTS, and/or each of them, proceeded as if everything was normal and nothing had changed, and the *Grand Princess* departed as scheduled on February 21, 2020.

### E.    DEFENDANTS DID THIS BECAUSE THEY MAKE THE LION'S SHARE OF THEIR PROFITS FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES

72.    As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But 3 players — Carnival Corporation & PLC, Royal Caribbean Cruises LTD, and Norwegian Cruise Line HLD — control[led] roughly 75% of the market."[42]

73.    "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018. Cruise ships make this money through two channels: Ticket sales and onboard purchases (e.g., alcoholic drinks, casino gambling, spa treatments, art auctions, and shore excursions), which passengers pay for with pre-loaded cruise cards and chip-equipped wristbands."[43]

/ / /

/ / /

/ / /

---

[42] https://thehustle.co/the-economics-of-cruise-ships/
[43] *Id.*

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

74. "On average, tickets account for 62% of total revenue and onboard purchases make up the remaining 38%. **Though tickets represent a majority of revenue, *onboard purchases account for the lion's share of the profit*, according to several experts**."[44]

> **As a high fixed-cost business, a cruise ship relies on getting as many passengers as possible *on the ship*** — even at fire-sale rates. **The major cruise lines will often fill each ship to 105%-110% capacity, then upsell its captive consumers on additional services.**
>
> **"They have mastered the ability to get their hands into people's pockets and to take out every last dollar,"** says Ross A. Klein, a professor at Memorial University of Newfoundland, who has closely studied the cruise ship industry. "They can almost give a cabin away for free and still make a profit."
>
> …
>
> On average, a passenger will spend $1,060 ($151/day) on a ticket and $650 ($92/day) on onboard purchases. After subtracting overhead costs, a ship will make out with roughly $291 in net profit per passenger, per cruise.
>
> **That means that at full capacity, a single ship like Royal Caribbean's Symphony of the Seas might make $9.8m in revenue ($1.7m of which is profit) during one 7-day excursion. *That's $239k in profit per day at sea*.**[45]

75. This creates an obvious financial incentive for DEFENDANTS, and/or each of them, to knowingly board passengers on a cruise ship armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket. And that is what happened here.

## F. DEFENDANTS FAILED TO WARN OR ADVISE PASSENGERS OF THE VIRUS BEING ON-BOARD THE GRAND PRINCESS UNTIL MARCH 4, 2020—OVER A WEEK AFTER BOARDING

76. MRS. WONG and her husband long-planned a two-week cruise to Hawaii aboard the *Grand Princess* to celebrate MR. WONG's 64th birthday. The

---

[44] *Id.*

[45] *Id.*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Wong's had been married for thirty-four (34) years and have one son, Benjamin. Also joining them aboard the *Grand Princess* were MRS. WONG's sister and brother-in-law and MR. WONG's brother, mother, sister, and brother-in-law.

77. MRS. WONG booked travel for her and her husband online through Sacramento-based travel agent Zoe's Cruise & Tours on December 20, 2019, for a total fare of $2,392.16.

78. Noted on the invoice was MR. WONG'S February 23, 2020 birthday celebration. Per the PRINCESS Booking Confirmation, which bore the slogan "Come back new," MR. and MRS. WONG were immediately subject to an aggressive regime of cancellation penalties under which they would forfeit $400 from the very moment they purchased the tickets, 50% of the purchase price one week later, 75% as of January 24, 2020, and 100% as of February 7, 2020, two weeks from departure.

79. On February 21, 2020, MRS. WONG and MR. WONG, along with their friends and family, boarded the *Grand Princess* to celebrate MR. WONG'S much-awaited two-week birthday cruise. They were the unsuspecting passengers on a doomed voyage that tragically would be MR. WONG'S last trip, ever. On February 21, they boarded the *Grand Princess* in San Francisco, and according to their itinerary, departed at 4:00 pm to cruise at sea through February 25, 2020. The *Grand Princess* itinerary addressed herein is from the Princess Cruise Line website.[46]

80. On February 26, 2020, at 8:00 am, the *Grand Princess* arrived at the Hawaiian island of Kauai. From February 26 through 29, the *Grand Princess* sailed amongst the Hawaiian Islands, with additional stops on Oahu, Maui, and finally on Hawaii (the "Big Island") on the evening of February 29, 2020.

81. On February 29, 2020, the *Grand Princess* was scheduled to depart from Hawaii at 5:00 pm, on the return voyage towards the mainland. The ship was scheduled to be at sea from March 1 to March 4, with a stop in Ensenada, Mexico.

---

[46] https://www.icruise.com/itineraries/15-night-hawaiian-islands-cruise_grand-princess_2-21-2020.html (last accessed September 10, 2020).

82.    On March 4, 2020, however, MRS. WONG and MR. WONG, along with the rest of their family, were first alerted to the virus being aboard the *Grand Princess* from a "Guest Health Advisory – Coronavirus" letter from Dr. Tarling. The letter notified passengers of potential exposure to the virus and announced that the Ensenada stop scheduled for March 5 was cancelled so the ship could return directly to San Francisco. No independent findings were reported. Both MR. and MRS. WONG were in fear about being quarantined on the ship because their cabin had no windows and they understood the air they were breathing was circulating through the ship's central ventilation system.  No mention was made of the overlapping passengers and crew from the Mexico cruise.



83.    On March 4, 2020, California Governor Gavin Newsom declared a state of emergency regarding the COVID-19 outbreak.  In an attempt to manage the crisis, the State of California refused to allow the *Grand Princess* to return to port as planned in San Francisco.

84.    Defendants' March 4 "Health Advisory – Coronavirus" downplayed the passengers' exposure, noting that "the United States Centers for Disease Control and

[47]https://thehill.com/changing-america/well-being/prevention-cures/486807-couple-still-on-grand-princess-cruise-files-1 (Last accessed May 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Prevention (CDC) that they are investigating a small cluster of COVID-19 (coronavirus) cases in Northern California connected to a *Grand Princess* voyage that sailed roundtrip from San Francisco from February 11 to February 21." Also explicitly downplaying the exigent nature of the contagion, Dr. Tarling characterized COVID-19 as akin to the flu, stating "COVID-19 causes mild illness in about 80% of cases, typically with symptoms of fever, cough and shortness of breath, like the common cold or flu." But he further downplayed the life threatening nature of COVID-19 to the rest, stating "About 20% of people develop more severe symptoms" but equated the risk factors for these "more susceptible individuals" as "those with other chronic medical condition, as it does with regular flu." It was already known that nothing could be further from the truth as COVID-19 was contagious and deadly.

85. From March 4 until March 9, 2020, the *Grand Princess* remained in a holding pattern in the waters off San Francisco Bay for several days of political negotiations that included input from the federal government in Washington before the *Grand Princess* was finally permitted to land in the Port of Oakland on March 9, 2020.

86. Passengers were allowed to disembark in stages, beginning on March 9, 2020. MRS. WONG and MR. WONG were held onboard, and not allowed to disembark until March 10, followed by others thereafter. Passengers with symptoms disembarked first and were sent to Asilomar State Beach and Conference Grounds for treatment, while those without symptoms went to Travis Air Force Base, an hour north in Solano County, for further isolation in quarantine.

/ / /

/ / /



48

**G.    DEFENDANTS UNLOAD PASSENGERS TO DIE ONSHORE**

87.    In the time since the *Grand Princess* departed from San Francisco for Hawaii on February 21, 2020, had to turn back to San Francisco, but allowed to finally anchor in Oakland, MR. & MRS. WONG were not allowed to disembark until March 10, 2020.

88.    Neither MRS. WONG nor MR. WONG was visibly infected or ill when they disembarked in Oakland on March 10, 2020. They were therefore transported by bus to Travis Air Force Base for further quarantine, along with the other passengers not exhibiting symptoms.

/ / /

/ / /

---

[48] https://news.sky.com/story/coronavirus-21-people-stranded-on-grand-princess-cruise-ship-test-positive-for-covid-19-11951315 (Last accessed May 5, 2020).

**FIRST AMENDED COMPLAINT; CASE NO. 2:20-CV-04727-DMG-JC**                    28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP



49

89.    It was not until several days after disembarking and being in quarantine at Travis, did MRS. WONG and MR. WONG begin to feel ill.  MR. WONG developed a cough with a high fever. MRS. WONG took his temperature of 100 degrees.  MRS. WONG developed a cough, had trouble breathing, was unable to sleep, and felt fatigued and tired.

90.    The following day, March 16, 2020, MR. WONG'S fever persisted, he continued coughing, and his condition worsened. Both MRS. WONG and MR. WONG were tested for the coronavirus that morning but did not get their test results back that day.  That evening, MR. WONG was transferred to Kaiser Permanente's Vallejo Medical Center hospital in Vallejo, California. MRS. WONG never saw MR. WONG alive again after that date.

91.    On March 21, 2020, MRS. WONG learned that she tested positive for the coronavirus.  MRS. WONG was transferred to a hotel in San Carlos, California for further quarantine, over an hour away from the hospital in Vallejo where MR. WONG was undergoing treatment.

---

49 http://www.mercurynews.com/2020/03/09/photos-coronavirus-stricken-grand-princess-arrive-at-port-of-oakland (Last accessed May 5, 2020)

92.    On March 24, 2020, MR. WONG died at Kaiser Permanente's Vallejo Medical Center.  MRS. WONG was not permitted to see him in his final hours.

93.    On March 25, 2020, MRS. WONG was released from the hotel in San Carlos and allowed to return home.

94.    As of the date of this amended filing, MRS. WONG is still recovering from her COVID-19 symptoms, continues to suffer from fatigue, has difficulty breathing, is unable to work, and is confined to her home in San Francisco.

95.    On May 2, 2020, The Wall Street Journal reported that according to the U.S. Department of Health and Human Services, five people on the Hawaii *Grand Princess* cruise had died and 131 passengers tested positive for COVID-19.  County officials in California as of that date had traced five COVID-19 cases to the prior *Grand Princess* Mexico cruise, including two deaths.[50]

96.    As a direct and proximate result of DEFENDANTS' negligence and gross negligence, MR. WONG has died, and MRS. WONG has been infected with the coronavirus and suffered from COVID-19, requiring medical treatment.

97.    In addition, PLAINTIFFS were traumatized by the fear of developing COVID-19. They were confined to the *Grand Princess* as the virus attacked and infected passengers throughout the ship, and thereafter were confined at Travis Air Force Base and other locations in California as they underwent treatment and isolation in quarantine.

## H.    CARNIVAL IS NOW THE TARGET OF CONGRESSIONAL INVESTIGATION

98.    The history of CARNIVALS' disregard of the health and welfare of their passengers has not gone unnoticed, as Congress is looking into how so many people fell ill aboard cruise ships in the present crisis and the industry's failure to contain the spread in time. On May 1, 2020, the Chair of the U.S. House of Representatives' Committee on Transportation and Infrastructure Peter DeFazio and the Chair of the

---

[50] "Cruises Set Sail Knowing the Risk," The Wall Street Journal, May 2, 2020.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

House Subcommittee on Coast Guard and Maritime Transportation Sean Patrick Maloney summarized this history in a records request letter to CARNIVAL formally opening an inquiry.[51] In the words of the DeFazio-Maloney letter:

> *Norovirus and other communicable diseases are not new public health threats to the cruise line industry. In 2010, the World Health Organization (WHO) identified norovirus and influenza outbreaks as "the major public health challenges for the cruise industry." This assessment was made an entire decade before COVID-19 emerged on the world's stage. . . .*

> *Cruise ships are a fertile breeding ground for infectious diseases due to their environmental conditions and physical structure. "Cruise ships passengers spend prolonged periods in close proximity to other passengers and crew, facilitating the rapid spread of highly infectious agents such as influenza," the Journal of Travel Medicine reported in 2018. Today, the CDC warns: "Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships."*

99. Nevertheless, CARNIVAL, PRINCESS and Dr. Tarling disregarded this crucial information and continued their operations as though nothing had changed, and despite their vaunted commitment to help aboard their ships, continued marketing their cruises largely as before. As the DeFazio-Maloney letter noted:

> *As of April 23, 2020, none of the front facing web-pages from any of Carnival's nine affiliated cruise lines , – Carnival Cruise Line, Princess Cruises, Holland America Line,15 Seabourn, P&O Cruises (Australia), Costa Cruises, AIDA Cruises, P&O Cruises (UK), and Cunard – mentioned a single word about COVID-19, coronavirus, or the precautions these cruise lines intend to take once the CDC lifts its "No Sail Order" for cruise lines. Instead, these sites are advertising various images of couples dining and dancing, musicians entertaining, and lines of children holding hands and playing.*

/ / /

/ / /

---

[51] Letter to Mr. Arnold W. Donald, President and CEO, Carnival Corporation & PLC, from the Committee on Transportation and Infrastructure, U.S. House of Representatives, Washington, D.C. (May 1, 2020).

52

## VI.   NOTICE

100.   Section 15(A)(i) of the Passage Contract purports to require that claimants provide notice to PRINCESS and CARNIVAL of any potential claims within six months from the date of the underlying harm before commencing litigation. PLAINTIFFS are resolute that this egregiously unfair provision is unenforceable. Nevertheless, PLAINTIFFS have complied with this purported requirement by providing written notice to DEFENDANTS' by overnight mail on May 21, 2020.

## VII.   CLAIMS

### FIRST CLAIM

### NEGLIGENCE – PERSONAL INJURIES AND WRONGFUL DEATH

**(On Behalf of Plaintiffs MRS. WONG and BEJAMIN WONG,**

**Against Each Defendant)**

101.   PLAINTIFFS incorporate herein by reference all of the allegations in this complaint.

---

52 https://www.mercurynews.com/2020/03/10/watch-drone-footage-of-the-coronavirus-stricken-grand-princess-cruise-ship-as-passengers-disembark-at-the-port-of-oakland/ (Last accessed May 5, 2020)/

102.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, negligently, carelessly, recklessly, and/or unlawfully boarded the Grand Princess docked in San Francisco on February 21, 2020 and departed therefrom for Hawaii, which served as the legal cause of injuries and damages herein suffered by PLAINTIFFS.

103.   As alleged in more detail above, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, failed to use reasonable care to prevent harm to others, including PLAINTIFFS herein, when (among other things) they failed to warn MR. and MRS. WONG of the deadly virus aboard the ship and allowed MR. and MRS. WONG to board without implementing any sort of protective measures.

104.   MRS. WONG was harmed by DEFENDANTS CARNIVAL and PRINCESS' negligence when she contracted and suffered from COVID-19. Additionally, MRS. WONG was harmed by DEFENDANTS CARNIVAL and PRINCESS' negligence when her husband contracted and died from COVID-19. MRS. WONG (MR. WONG'S SURVIVING SPOUSE) is a proper wrongful death heir pursuant to California Code of Civil Procedure § 377.60(a).   Further, MRS. WONG was harmed by DEFENDANTS CARNIVAL and PRINCESS' negligence when she suffered the distress of contracting a deadly virus, observing her spouse perish, feared for her own life, and was unable to spend time with her husband in his final hours.

105.   BEJNAMIN WONG was harmed by DEFENDANTS CARNIVAL and PRINCESS' negligence when his father contracted and died from COVID-19. BEJNAMIN WONG (MR. WONG'S SON) is a proper wrongful death heir pursuant to California Code of Civil Procedure § 377.60(a).

106.   DEFENDANTS CARNIVAL and PRINCESS' failure to use reasonable care to prevent harm was a substantial factor in causing PLAINTIFFS' harm.

107.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, participate in the marketplace as common carriers. Tickets for its cruises are marketed to the general public. In addition to a vacation, as part of the contractual relationship reached between DEFENDANTS and their customers, passengers aboard DEFENDANTS' cruise ships may reasonably expect and do expect safe passage on ocean-worthy vessels free from any known or knowable dangers or perils.

108.   Common carriers must carry passengers safely. Common carriers must use the highest care and the vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business. DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, failed to do so here.

109.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, negligently, wrongfully, unlawfully, and/or recklessly invited and boarded MR. and MRS. WONG onto the deadly cruise ship armed with COVID-19, without providing any notice, warning, or precautionary medical apparatuses, such as masks, and without imposing any safety precautions, such as social distancing, and/or imposing quarantine on prior exposed passengers and/or crew. DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, negligently, wrongfully, unlawfully, and/or recklessly boarded passengers, including PLAINTIFFS MR. and MRS. WONG, without disinfecting, decontaminating, and/or sanitizing the exposed surfaces of the cruise ship and/or administering any COVID-19 tests or screening to any prior passengers and/or crew, leaving all new passengers,

including MR. and MRS.  WONG, completely, unknowingly, and inescapably exposed to the deadly virus.

110.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, had knowledge of the infectious and deadly danger posed by the Coronavirus before they allowed new passengers to board the *Grand Princess* in San Francisco on February 21, 2020, joining them with 62 prior passengers and 1,000 crew members who had traveled with and been in close contact with the infected passenger for at least seven (7) days prior.

111.   As a direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, MR. WONG died from COVID-19 and MRS. WONG was infected with the coronavirus and suffered from COVID-19.

112.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, Plaintiff MRS. WONG was injured in her health, strength, and activity, sustained injuries to her body and mind, all of which have caused Plaintiff great physical, mental, emotional, and nervous pain and suffering.  Plaintiff is informed and believes, and upon such information and belief alleges, that such injuries have resulted in debilitating injuries, all to her general damage in a sum according to proof.

113.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others,  hereinabove alleged, Plaintiff MRS. WONG was required to, and continues to, employ physicians and other health care providers to examine, treat and care for her injuries, and have incurred, and will continue to incur, medical and incidental expenses for such examination, treatment rehabilitation and care in an amount according to proof.

114.   As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, Plaintiff MRS. WONG was gainfully employed, and/or capable of gainful employment through her education, training, and/or experience. By further reason of DEFENDANTS' wrongful conduct hereinabove alleged, Plaintiff MRS. WONG suffered a loss of income and/or a loss of earning capacity in an amount according to proof.

115.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others,  hereinabove alleged, Plaintiff MRS. WONG contemporaneously perceived her husband, Plaintiff MR. WONG dying from COVID-19, and thereby suffered extreme emotional distress, including nervousness, grief, anxiety, worry, mortification, shock, indignity, apprehension, terror or ordeal, all in an amount according to proof.

116.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, PLAINTIFFS MRS. WONG and BENJAMIN WONG suffered and continue to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, society, and moral support, all in an amount to be determined.

117.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, Plaintiff MRS. WONG incurred funeral and burial expenses, all in an amount to be determined.

118.   In doing the wrongful acts as hereinabove alleged, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, acted with oppression, fraud, and malice and/or with conscious and/or willful disregard for the health, safety and general welfare and rights of PLAINTIFFS. The conduct of DEFENDANTS CARNIVAL and PRINCESS,

and/or each of them, and their agents, representatives, employees, officers, and others, was a substantial factor in causing PLAINTIFFS' harm.  Such actions were done with malice, oppression and/or fraud and were and are despicable, shocking and offensive and entitle PLAINTIFFS to an award of punitive damages against DEFENDANTS CARNIVAL and PRINCESS and/or each of them, and their agents, representatives, employees, officers, and others, in an amount to be determined at trial. DEFENDANTS' CARNIVAL and PRINCESS'S failure to heed the warnings of the CDC and to apply the knowledge gained from the outbreak aboard the *Diamond Princess,* and their decision to proceed with the *Grand Princess* cruise to Hawaii without enacting heightened health and medical screenings for all passengers and crew, without disinfecting or decontaminating the ship, and without warning PLAINTIFFS and passengers of the perils of boarding a ship armed with SARS-CoV-2, both constitute extreme departures from what a reasonable cruise ship owner and operator would do and reflect callousness and an extreme, willful, and outrageous disregard for the health and safety of its passengers. In all of these decisions, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, were driven by profit, and chose not to expend resources for the safety and health of passengers, but rather keep them ignorant and in the dark so they would proceed to enjoy their vacation as planned and spend money on onboard purchases, where DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, make their largest profits.

### SECOND CLAIM

### NEGLIGENCE – SURVIVAL ACTION

### (On Behalf of Plaintiffs MRS. WONG,

### Against Each Defendant)

119.   PLAINTIFFS hereby re-allege and incorporate herein by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

120.   MR. WONG suffered personal injuries and associated emotional distress from the time he contracted and/or suffered symptoms from COVID-19 as a result of DEFENDANTS' negligence.  Prior to his death, MR. WONG had legal standing to bring a claim for personal injuries and emotional distress suffered as a result of DEFENDANTS' negligence.

121.   Since his death, MRS. WONG has served as representative for the ESTATE OF MR. WONG and is authorized as successor in interest with respect to MR. WONG'S losses in this tragic incident, to pursue any and all legal claims for damages related thereto, and to recover damages for expenses incurred related to medical and/or emergency services related to this incident.  As the successor-in-interest to MR. WONG'S estate, MRS. WONG has standing to bring this survival action pursuant to California Code of Civil Procedure § 377.30.  Please refer to the Successor in Interest Declaration of EVA YUK WAH MA WONG filed by PLAINTIFFS on August 10, 2020 [Docket no. 26-1].

122.   At all time prior to this incident, DEFENDANTS CARNIVAL and PRINCES, and/or each of them, and their agents, representatives, employees, officers, and others, negligently, carelessly, recklessly, and/or unlawfully acted and/or failed to act as hereinabove set forth, so as to serve as the legal cause of death to MR. WONG.

123.   As a direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, hereinabove set forth, prior to MR. WONG's death, expenses were incurred for emergency and their agents, representatives, employees, officers, and others, and medical services.

124.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, failed to use reasonable care, hereinabove set forth, MR. WONG also endured great emotional distress, pain and suffering from the COVID-19 virus and from the fear of contracting and/or dying from

the virus before showing symptoms, all before eventually dying approximately four weeks later.

## VIII.    <u>PRAYER FOR RELIEF AND DEMAND FOR JURY</u>

WHEREFORE, PLAINTIFFS, on behalf of themselves and all persons similarly situated, respectfully prays that this Court grant the following relief:

1.      For compensatory and general damages in an amount according to proof;

2.      For past and future medical, incidental, and service expenses according to proof;

3.      For pre- and post-judgment interest on all damages as allowed by the law;

4.      For costs of suit incurred herein;

5.      For attorney fees under existing law;

6.      For an award of punitive damages; and

7.      For such other and further relief as the Court may deem just and proper.

### <u>JURY DEMAND</u>

Plaintiff further demands trial by jury on all issues.

Dated: September 14, 2020            **COTCHETT, PITRE & McCARTHY, LLP**

By: */s/ Nanci E. Nishimura*
            NANCI E. NISHIMURA
            ALISON E. CORDOVA
            *Attorneys for Plaintiffs*

Dated: September 14, 2020            **ANDERLINI & McSWEENEY LLP**

By: */s/ P. Terry Anderlini*
            P. TERRY ANDERLINI
            CAROLINE A. REITZ
            *Attorneys for Plaintiffs*